**In re TEMPLE ZION, Debtor.**

**Bankruptcy No. 88–13659S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 17, 1991.

W.J. Winterstein, Jr., Astor, Weiss & Newman, Philadelphia, Pa., for debtor.

Adam H. Isenberg, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for RTC.

James J. O'Connell, Philadelphia, Pa., U.S. Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

The Debtor's instant motion to modify its confirmed Plan of Reorganization prior to its substantial consummation, opposed by its major creditor, requires us to determine whether the plan meets all of the applicable prerequisites for confirmation set forth in 11 U.S.C. § 1129. We conclude, *inter alia,* that the plan is feasible; that a class whose status has potentially been improved by its treatment is nevertheless impaired; and that a plan which contemplates payment of a secured creditor's claim in full within about five months provides that creditor with "fair and equitable" treatment because it will allow the creditor to realize the "indubitable equivalent" of its claim. Therefore, the Debtor's motion is granted.

### B. PROCEDURAL AND FACTUAL HISTORY

TEMPLE ZION ("the Debtor") is a Jewish religious organization which owns a six-acre parcel of real estate containing a synagogue located at 1620 Pine Road, Abington Township, Huntingdon Valley, Pennsylvania. It filed a voluntary Chapter 11 bankruptcy case on October 19, 1988.

The Debtor's principal liability is an indebtedness secured by a first mortgage on its realty which is presently held by the RESOLUTION TRUST CORPORATION ("RTC"), as conservator of Atlantic Financial Federal ("AFF"), the amount of which the parties stipulated, as of November 28, 1989, was $583,256. Its only other debts are an obligation secured by a second mortgage on its realty held by Arch–Build Corporation and Gerald F. Swan Associates (collectively "Arch–Build") in an amount of $41,000.00; obligations in reference to deposits delivered to it to reserve its facility for social events in an amount of $4,700; and miscellaneous unsecured claims in an approximate amount of $3,000.00.

Approximately half of the Debtor's realty is unimproved. Counsel for the Debtor and AFF stipulated during the hearing on this matter on November 8, 1989, that the fair market value of the Debtor's realty at that time was $1.4 million. The Debtor's other assets include fixtures, furniture, equipment, membership contributions, and miscellaneous personalty used in the operation of a synagogue. The total value of the Debtor's assets is approximately $1.5 million.

AFF became actively involved in the Debtor's bankruptcy case immediately after its filing. On October 21, 1988, two days after the petition was filed, counsel for AFF entered an appearance. Although the value of AFF's collateral exceeds the debt by almost three to one, AFF has been reluctant to work with the Debtor and, as a result, the Debtor and AFF have been at odds from the beginning.[1] On January 24, 1989, AFF opposed the Debtor's motion to extend time to file a plan and solicit acceptances, which this court nevertheless granted on February 8, 1989. AFF and the Debtor subsequently entered into a stipulation, approved by this court on March 16, 1989, further extending the Debtor's exclusive right to file a plan of reorganization until April 18, 1989, and to solicit acceptances until June 18, 1989. Unable to meet this deadline, the Debtor requested, on April 18, 1989, another extension of time to file a plan of reorganization. By Order dated April 19, 1989, we allowed the Debtor until September 1, 1989, to file a plan and disclosure statement, warning that failure to comply may result in dismissal or conversion of the case to Chapter 7.

The Debtor filed a plan of reorganization on June 2, 1989. Shortly thereafter, on July 10, 1989, AFF filed a motion to convert or dismiss the case, a hearing on which was ultimately scheduled for September 19, 1989. The chain of events that occurred prior to the September 19, 1989, scheduled hearing date, indicated that the Debtor was diligently working toward proposing a confirmable plan and AFF's motion to convert or dismiss was not heard.

The Debtor filed a Disclosure Statement and an Amended Plan of Reorganization on August 16, 1989. On September 25, 1989, AFF objected to the Debtor's Disclosure Statement. The Debtor filed a Second Amended Plan of Reorganization ("the Plan") and a new Disclosure Statement on September 26, 1989. AFF objected to the new Disclosure Statement as well and filed its own Liquidating Plan of Reorganization on October 3, 1989. The Debtor and AFF were ordered to simultaneously file Briefs regarding the confirmability of the respective proposed plans of reorganization by November 1, 1989, which Briefs were timely filed. A hearing was held on November 8, 1989, attended by the Debtor and AFF, to consider both proposed Plans of Reorganization and the Debtor's Disclosure Statement. At that hearing, counsel for AFF and the Debtor were given an opportunity to prepare and submit additional briefs, but both indicated that such were not necessary.

As the result of a settlement conference conducted by the Honorable William H. Gindin of the District of New Jersey on November 17, 1989, the parties executed a settlement Stipulation of November 28,

---

1. AFF's reluctance to work with the Debtor may have been due to the fact that the obligation with the Debtor is a long term obligation at a fixed interest rate of 8½%. AFF and RTC as its successor may perceive this bankruptcy as a good opportunity to sever a relationship with the Debtor and invest funds at a more profitable interest rate.

1989. This resulted in consensual confirmation of the Debtor's Plan on January 8, 1990.

The centerpiece of the Plan was the sale of the unimproved portion of the Debtor's realty to McCracken Construction Co. ("McCracken") for subdivision into six residential building lots, at a price of $420,000. The proceeds of this sale, to be consummated no later than July 31, 1990, were to be utilized to cure the Debtor's arrearages to AFF, and the Debtor was then to resume payments under the original mortgage until it was liquidated. In the interim, payments of $1,500 monthly were to be made to AFF. The Stipulation further provided that, if the Debtor failed to timely make the $420,000 payment, the case would be dismissed with prejudice.

On August 6, 1990, the Debtor filed a motion seeking to amend the Plan because the sale had not taken place by July 31, 1990, due to unforeseen delays in obtaining requisite zoning approvals for the planned subdivision. While RTC initially opposed this motion, it ultimately executed a Stipulation of September 21, 1990, which modified the Plan only insofar as it set back the July 31, 1990, sale and payment date to December 15, 1990.

On January 22, 1991, the RTC filed a motion to dismiss this case because of the Debtor's failure to close the sale or make the lump-sum payment by the new established date of December 15, 1990, either. The Debtor answered by stating that, despite its efforts to accomplish same, the prerequisite zoning board approvals had still not been obtained and that it should be granted a further extension until June 30, 1991, to close the sale and remit the contemplated proceeds to RTC.

When the matter came before us on February 20, 1991, RTC requested a continuance of the hearing on its motion until March 6, 1991, to attempt to resolve the matter amicably, specifically requesting that the Debtor not file a further motion to further amend the Plan in the interim. However, on March 6, 1991, the parties announced that no settlement had been reached. After brief testimony on that

date from Norman Yermish, a member of the Debtor's Executive Board and its former President ("Yermish"), we entered an Order denying relief to the RTC on the conditions that the Debtor: (1) file an expedited Motion seeking to modify its confirmed Plan of Reorganization on or before March 15, 1991, requesting that a hearing be scheduled on April 3, 1991; (2) pay at least $2,500 to RTC on or before April 15, 1991, and the 15th day of each successive month until the sale of the unimproved realty; and (3) consummate the transaction to sell the unimproved realty on or before September 1, 1991.

The Debtor filed the requisite expedited motion seeking to further amend its Plan on March 15, 1991. The amendment sought by the Debtor contemplated continued payments of $2,500 monthly pending the contemplated sale to McCracken. An increase from the $1,500 figure was proposed because that payment was insufficient to cover the interest on the loan, and, consequently, the $583,256 balance due on the loan had increased. The Debtor expressed a willingness to not only cure the mortgage arrearages, but to liquidate the RTC's debt entirely by September 3, 1991.

The Debtor's motion is substantively based upon 11 U.S.C. § 1127(b), which provides as follows:

(b) The proponent of a plan or the reorganized debtor may modify such plan at any time after confirmation of such plan and before substantial consummation of such plan, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title. Such plan as modified under this subsection becomes the plan only if circumstances warrant such modification and the court, after notice and a hearing, confirms such plan as modified, under section 1129 of this title.

On April 1, 1991, the RTC filed a host of Objections to the Plan as follows: (1) Infeasibility, pursuant to 11 U.S.C. § 1129(a)(11), based upon the alleged unlikelihood of the Debtor's obtaining the requisite zoning variances to allow the sale to

McCracken to be consummated in timely fashion, per even the latest amendment, and the alleged inability of the Debtor to both pay Arch–Build and pay it off in full; (2) Inability of the Debtor to obtain the votes of any impaired classes, in violation of 11 U.S.C. § 1129(a)(10), in light of the fact that, with the withdrawal of AFF's affirmative vote, the only parties voting in favor of the Plan were parties who made deposits for future events to the Debtor ("the Depositors"). The Depositors were alleged to be both insiders of the Debtor and unimpaired; (3) Inability of the Debtor to satisfy the requirements of 11 U.S.C. §§ 1129(a)(8), (b)(1), (b)(2)(A) in light of the RTC's withdrawal of AFF's vote in favor of the Plan; (4) Failure to satisfy 11 U.S.C. § 1129(a)(7); and (5) Lack of good faith, in violation of 11 U.S.C. § 1129(a)(3).

The only witness at the hearing on April 3, 1991, was Yermish. The record of the proceedings on November 8, 1989, was consolidated by agreement. Yermish testified that some of the Depositors were not members of the Debtor. He conceded that certain problems with the terrain of the unimproved realty had reduced the number of potential building lots or the parcel to be sold to McCracken from six to five, and, accordingly, the sale price to McCracken, whose interest has not waned, had been reduced to $340,000. However, he stated that negotiations of the Debtor with the Bank of Old York Road ("BOYR") to obtain a new loan for the remaining balance made him confident that funds would be obtained to pay off RTC in full on September 3, 1991. RTC offered no rebuttal testimony.

## C. DISCUSSION

### 1. THE DEBTOR MAY PROCEED TO ATTEMPT TO MODIFY ITS PLAN.

■ The question most frequently at issue in contested matters arising under § 1127(b) is whether a plan has been "substantially consummated" prior to the presentation of a motion to modify the plan, which would preclude any modification. *See* 5 COLLIER ON BANKRUPTCY, ¶ 1127.02, at 1127–3 to 1127–5 (15th ed.

1990); and Comment, *Postconfirmation Modification of the Plan of Reorganization: Section 1127(b)*, 5 BANKR.DEV.L.J. 211 (1986). However, since the sale to McCracken, which is the centerpiece of the Plan has never occurred, it is apparent that "substantial consummation" of the Plan has not been effected here.

■ The Debtor is therefore free to modify its Plan. The modification affects only the interests of RTC. It does not affect, either adversely or otherwise, any other allegedly impaired class in any direct way. Therefore, further disclosure pursuant to 11 U.S.C. § 1125 clearly appears unnecessary. *See In re American Solar King Corp.*, 90 B.R. 808, 823–24 (Bankr.W.D. Tex.1988).

The principal adverse consequence to the Debtor in advancing the instant plan modification is to allow AFF/RTC an opportunity to abandon its era of cooperation with the Debtor and revert to its previous pose of refusing to work with the Debtor by raising all of the Objections to confirmation of the Debtor's Plan which it stifled in consenting to the Plan and the first modification to it. We must, therefore, determine whether the Plan, as amended, and, in some instances, as originally conceived, satisfied all of the pertinent requirements of 11 U.S.C. §§ 1129(a), (b).

### 2. THE DEBTOR'S PLAN IS FEASIBLE.

■ Section 1129(a)(11) requires as a condition of confirmation that the court find that

[c]onfirmation of the plan is not likely to be followed by liquidation, or the need for future financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

In other words, the plan must be feasible. As commentators have noted:

Basically, feasibility involves the question of emergence of the reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. It is not necessary that

success be guaranteed, but only that the plan present a workable scheme of organization and operation from which there may be a reasonable expectation of success.

5 COLLIER, *supra,* ¶ 1129.2(11], at 1129–36.11. *See also, e.g., In re 222 Liberty Associates,* 108 B.R. 971, 985–86 (Bankr.E. D.Pa.1990); and *In re Orlando Investors, L.P.,* 103 B.R. 593, 600 (Bankr. E.D.Pa. 1989).

The purpose of § 1129(a)(11) is to avoid confirmation of "visionary schemes which promise creditors ... more under a proposed plan than the debtor can possibly attain after confirmation." 5 COLLIER, *supra,* ¶ 1129.2[11] at 1129–36.11.

Case law has established that bankruptcy court must consider several factors in making a feasibility determination: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any other related matters which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan. *See, e.g., 222 Liberty Associates,* 108 B.R. at 986; *In re Gulph Woods Corp.,* 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re Landmark at Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J.1980). Many of these elements are applicable only to business corporations rather than non-profit religious corporations, such as the instant Debtor. However, they all are illustrative of the type of considerations which a court must make in weighing the feasibility of any Plan.

As one court notes, the time within which payouts are made is also a consideration. "The longer the debtor proposes a payout, the more difficult it may become to prove distant future ability to service accounts." *In re White,* 36 B.R. 199, 203–204 (Bankr. D.Kan.1983). As stated by our colleague, Judge Fox, "at bottom, ..., one must focus upon the specific terms of the plan in order to determine its plausibility." *Orlando Investors, supra,* 103 B.R. at 600.

The Code authorizes a menu of ways in which a debtor may implement its plan. The Debtor proposes to implement its plan by selling the unimproved portion of its real property to McCracken and making a well-secured loan from another bank. Section 1123(a)(5)(D) of the Bankruptcy Code specifically permits a debtor to implement a plan through the "sale of all or any part of the property of the estate, either subject to or free from any lien."

█ RTC does not argue that the sale is an improper means of execution of the Debtor's plan. Rather, it contends that the Debtor cannot consummate the sale to McCracken because of pitfalls in McCracken's plan for the development of the realty. It also doubts the ability of the Debtor to make the $2,500 monthly payments and to make the loan necessary to liquidate RTC's debt.

At the November 8, 1989, hearing, Robert McCracken, the President of McCracken ("Robert"), very competently and candidly testified about the variances required before he could begin construction of the proposed residential houses on the property and the steps he had taken to procure these variances. Robert stated that, at its own expense, McCracken had retained an engineer to perform studies necessary to submit zoning variance applications to Abington Township. It was Robert's opinion, formed from ten years of experience in the field and based upon input from the engineer, that there is no reason to believe that McCracken would not be able to obtain the requisite variances.

Robert recognized that McCracken must obtain a "steep slope" variance which will permit it to cut through a slope and construct a road from the main street on which the realty is situated to the planned development. He also acknowledged that the Debtor's parking lot lies on the property to be sold to McCracken and that this lot must be moved to the Debtor's remaining property before the proposed houses can be built. McCracken recognized that he will need to prove that, with the new parking

lot, the remaining land will be able to contain the required levels of water.

The Debtor informed McCracken that there may be a "seepage pit," *i.e.*, a pit containing stones that enables a piece of land to contain more water than it otherwise would be able to, on the property where the new parking lot is to be built which may obviate the need for this variance. Regardless of whether this seepage pit exists, Robert expressed confidence that the land can be made to conform to the water run off requirements. As stated by Robert at the November 8, 1989, hearing, "it's not rocket science" to construct a drainage ditch if one is required. Robert testified that he had given his engineer *carte blanche* to perform all studies necessary to obtain the variances on an expedited basis.

Robert's confidence that the variances could be obtained was evidenced by the expense that he had personally incurred in retaining an engineer to perform the required studies and by the time he had invested in the negotiation of the sale.

AFF called Lawrence Matteo, Superintendent of Code Enforcement for Abington Township ("Matteo"), to reinforce to the court that there is no guarantee that McCracken can obtain the necessary variances. AFF attempted to elicit testimony from Matteo to discredit that of Robert. Actually, Matteo's testimony was consistent with that of Robert, who candidly stated that, while he has every reason to believe that he will obtain the variances, there is no guarantee.

Matteo expounded on the steps that McCracken must take in order to obtain the variances. All applications must be approved by the Abington Township Planning Committee, the Montgomery County Planning Committee, the Pennsylvania Department of Environmental Resources, the Zoning Board and the Board of Commissioners. Matteo's testimony led us to believe that Robert's hope that he could obtain the variances quickly was wishful thinking. However, Matteo said that it is conceivable that the variances could be obtained within six months.

Since it is impossible for anyone to know what and when the numerous regulatory agencies will take action with respect to McCracken's variance applications, we are unpersuaded by RTC's contentions that the Debtor's plan is not feasible because there is no guarantee that the variances can be obtained by the September 1, 1991, deadline requested by the Debtor in the proposed modification to the Plan.

Time has of course proven that Robert's hopes for a quick approval of the variances was in fact too optimistic. However, McCracken has not lost interest in the project despite these unfortunate delays. There is no basis on the instant record, unadorned since this testimony of November 8, 1989, that McCracken cannot achieve the necessary variances and consummate the sale by September, 1991. RTC presented no new evidence at the April 3, 1991, hearing from Matteo or anyone else which tended to show that the variances are not obtainable by September 1, 1991. We are certainly not prepared to characterize the Debtor's projections as merely visionary.

The other aspects of RTC's feasibility objection relate to the alleged inability of the Debtor to meet the financial demands of the most recent version of the Plan. In particular, RTC questioned the Debtor's ability to make up the deficit of about $250,000 between the proceeds from the sale and the balance required to pay off its loan.

At the April 3, 1991, hearing, Yermish testified that the Debtor would be making a loan from the BOYR to pay off this balance. Yermish was forced to concede that the Debtor did not yet have a written commitment from the BOYR for this purpose. However, we decline RTC's invitation to conclude from these facts that the modified Plan is entirely visionary. It is certainly quite conceivable, even in the current period of tight money for realty investments, that the BOYR, or another lending institution, would loan $250,000 if it is secured by real estate worth approximately $1 million.

In its objections to the Debtor's Plan, as presented in November, 1989, AFF ex-

pressed great skepticism regarding the ability of the Debtor to keep the projected payments of $1,500 monthly current, because the Debtor had a poor recent payment history and its cash flow statistics for the previous several months had ended with negative figures on several occasions. RTC attempted to utilize these facts to support its contention that the Debtor's Plan was not feasible because the Debtor could not generate sufficient cash flow to make the regular monthly payments of $3,022.00 monthly after consummation of the sale, as required by the Plan.

At that time, the Debtor claimed to have a very active and supportive congregation, from which it was optimistic of obtaining significant contributions. At the time of the Debtor's filing, its congregation had dwindled to approximately 80 families. By November 8, 1989, however, the congregation had grown to about 300 families. The Debtor has apparently maintained and strengthened its financial stance, to the point where it is now able to pay $2,500 monthly instead of $1,500 monthly in the months intervening before the sale. The Debtor thus has and continues to develop promising earning potential, and appears to be run by capable management which has formulated a realistic plan for providing for payment of all of its creditors.

The Debtor's modified Plan, like the plan considered in *General Electric Credit Corp. v. Nardulli & Sons, Inc.*, 836 F.2d 184 (3d Cir.1988) (*"GECC"*), preserves RTC's secured status. The plan at issue in GECC provided that, if any assets in which the secured creditor had security were sold, "the monthly payments shall be reduced in the same proportion as the proceeds of the sale realized by GECC bear to the total balance due GECC." *Id.* at 188. The Court of Appeals concluded that this provision sufficiently preserved the security interest of GECC and another secured creditor treated in the same manner. *Id.*

The Debtor's instant modified Plan provides far greater protection to RTC than the plan at issue in *GECC*. The instant modified Plan specifically acknowledges the continuation of RTC's secured status,

unlike the plan at issue in *GECC, id.*, and provides RTC with collateral valued far in excess of its claim.

The modified Plan also contemplates a better treatment of the interests of AFF/RTC than did the original plan to which AFF consented. Instead of merely curing RTC's arrearages and making payments according to the original loan contract in the future, the Debtor now proposes to liquidate the obligation of RTC in its entirety by September 3, 1991. In addition, the Debtor is willing to increase the payments to RTC in the interim to prevent any increase in the amount of RTC's total claim. Finally, the court has made it clear that the extension of the consummation of the sale and payment to RTC of the proceeds to September 1, 1991 (or September 3, 1991, the next business day thereafter), will be the last granted to it by this court. The Debtor has made considerable efforts to provide consideration to RTC in exchange for extending the settlement date. We believe that its offers have been reasonable and that the modified Plan protects the interests of RTC better than the original Plan did.

For these reasons, we conclude that the Debtor's modified Plan is feasible, as required by § 1129(a).

### 3. THE VOTES OF THE DEPOSITORS SATISFY § 1129(a)(10).

■ The second objection of RTC is that the Debtor has failed to meet the requirement of 11 U.S.C. § 1129(a)(10), which provides that a plan can only be confirmed

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

RTC argues that the Debtor has categorized the Depositors as impaired only to effect nominal compliance with the requirement of 11 U.S.C. § 1129(a)(10) that at least one class of impaired claims votes to accept the Plan. Specifically, it contends that the Depositors are "insiders" whose votes cannot be counted, and that the class

of Depositors' rights are enhanced by the treatment which they receive in the Plan and therefore their class is not "impaired".

In the Debtor's report of plan voting, filed in the course of the confirmation hearing of November 8, 1989, the class of Depositors, as well as the non-creditor, insider class of members, were the only classes, in addition to the class containing AFF, to vote in favor of the plan. If the Depositors are determined not to be an impaired class, the withdrawal of AFF's affirmative vote would jeopardize the Debtor's satisfaction of the requirement of § 1129(a)(10) that at least one impaired, non-insider class must accept the plan.

The Bankruptcy Code, at 11 U.S. § 1124, specifies three ways in which a plan may leave a claim unimpaired, as follows:

Impairment of claims or interests.

Except as provided in section 1123(a)(4) of this title, a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

(1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest;

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to

which such claim or interest entitles the holder of

(3) provides that, on the effective date of the plan, the holder of such claim or interest receives, on account of such claim or interest, cash equal to—

(A) with respect to a claim, the allowed amount of such claim; or

(B) with respect to an interest, if applicable, the greater of—

(i) any fixed liquidation preference to which the terms of any security representing such interest entitle the holder of such interest; or

(ii) any fixed price at which the debtor, under the terms of such security, may redeem such security from such holder.

*See generally In re Future Energy Corp.,* 83 B.R. 470 (Bankr.S.D.Ohio 1988); and *In re Haardt,* 65 B.R. 697, 701 (Bankr.E.D.Pa. 1986) (FOX, J.)

The Debtor's Plan, unmodified in this respect, proposed to pay each Depositor a fifty (50%) percent refund if the event for which the deposit was given is cancelled. At the November 8, 1989, hearing, AFF admitted into evidence a Rental Contract, the form of which was generally used by the Debtor when it rents its facilities. The fifth paragraph of the Rental Contract provides as follows regarding refunds:

This contract may be cancelled for any reason within (10) days hereof, in which event the deposit will be refunded. The contract shall be non-cancellable thereafter. In the event of any breach, payment will be retained either as liquidated damages or on account of the damage sustained, as Temple Zion may elect.

RTC argues that, because the Debtor's plan proposes to pay the Depositors a fifty (50%) percent refund, even though the Rental Contract requires no refund after ten (10) days, the Depositors are not impaired.

Yermish testified, at the November 8, 1989, hearing, that, despite the language of the fifth paragraph of the Rental Contract, the Debtor's policy was in fact to be "flexible" regarding refunds when an event had been cancelled and to attempt to reschedule

the event or to provide at least a partial refund.

The fifty (50%) percent refund contemplated by the Debtor's Plan unquestionably would have impaired the rights of any Depositor who had cancelled an event scheduled within ten (10) days of entering into a Rental Contract. However, since the Depositors are all individuals who made deposits with the Debtor pre-petition, there would no longer be any Depositor covered by the plan who still has the ten (10) day cancellation period available to it.

We conclude, nonetheless, that the Depositors are impaired under § 1124. It is clearly established, with respect to impairment, that, "if the plan alters the legal, equitable or contractual rights of a class by improving the rights, *the class is impaired even though the economic interest of the class is improved and even though the class would not have been "materially and adversely affected."* ... 5 COLLIER, *supra,* ¶ 1124.03[1], at 1124–14 (15th ed. 1990) (emphasis added). To find impairment, all that § 1124 requires is that rights be "altered;" it does not require that the value of the rights be diminished. *Id.* at 1124–13. *See also, e.g., In re Elijah,* 41 B.R. 348, 350 (Bankr.W.D.Mo.1984); and *In re Barrington Oaks General Partnership,* 15 B.R. 952, 962 (Bankr.D.Utah 1981).

RTC's misconception that the Depositors' claims are not impaired is understandable. The word "impair" is commonly defined to mean "to weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner." BLACK'S LAW DICTIONARY 677 (5th ed.1979). The legislative history of § 1124, however, clearly indicates that it was the drafters' intent that the word "impair" assume a different meaning.

As noted in the legislative history accompanying § 1124, H.R.REP. NO. 595, 95th Cong., 1st Sess. 408 (1977); and S.REP. NO. 989, 95th Cong., 2nd Sess. 120 (1978), U.S.Code Cong. & Admin.News 1978, 5787, 5906, 6364, the concept of impairment differs substantially from the concept of "materially and adversely affected" appearing in § 107 of the predecessor Bankruptcy Act ("the Act"). *See Elijah, supra,* 41 B.R. at 350–51. Section 1124 is in some respects related to and in some respects distinguishable from § 107 of the Act. 5 COLLIER, *supra,* ¶ 1124.02, at 1124–7. Section 107 provided that

> [c]reditors or stockholders or any class thereof shall be deemed to be "affected" by a plan only if their or its interest shall be materially and adversely affected thereby.

In many circumstances, a claim that was "affected" under § 107 of the Act will be impaired under § 1124 of the Code.

> However, [under § 107] a secured creditor was not materially and adversely affected if the property securing his claim was transferred to a new corporation which assumed the claim, and the value of the collateral was equal to or exceeded the amount of the claim. *Gross v. Bush Terminal Co.,* 105 F.2d 930 (2nd Cir. 1939); *Central States Life Ins. Co. v. The Koplar Co.,* 85 F.2d 181 (8th Cir. 1936). Such a creditor would be impaired under the Code.

5 COLLIER, *supra,* ¶ 1124.02, at 1124–9.

Section 1124(1) states that a class is not impaired if the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest...." To repeat, "any alteration of the rights constitutes impairment even if the value of the rights is enhanced." *Id.,* ¶ 1124.03[1], at 1124–13.

Yermish's uncontradicted testimony, despite the terms of the Rental Contract, leads us to believe that it is the general practice of the Debtor to attempt to reschedule cancelled events or to provide Depositors at least a partial refund to Depositors. The proposed treatment of the Depositors under the Plan clearly alters the rights the Depositors have enjoyed in the past under the Debtor's general practice and their rights under the Rental Contract.

Regardless of Yermish's testimony, however, we still find that the proposed treatment of the Depositors under the Debtor's plan alters the Depositor's rights under the Rental Contract. It is immaterial to the

determination of impairment that the rights of the Depositors under the Rental Contract may be enhanced under the Debtor's plan. We therefore conclude that AFF's claim and the Depositors' claims are impaired as are their respective classes, under the Debtor's plan.

At the hearing of April 3, 1991, Yermish further testified, again without contradiction, that many of the Depositors were not members of the Debtor's congregation, although he could not be certain whether any of the non-member Depositors who had voted were members or non-members of the congregation. Despite the fact that this evidence tends to show that members (or former members) may have been included in the Depositor-class, this evidence falls short of proving that, when insiders are subtracted from the Depositor class, that class has failed to accept the plan.

We therefore find that the Debtor has properly categorized the Depositors as impaired, and that RTC has not proven that the votes cast by the Depositor class were those of insiders, which could not be considered for purposes of § 1129(a)(10). Hence, the § 1129(a)(10) requirement has been satisfied by the Plan.

RTC's contention that the Debtor's plan was not filed in good faith, as required by 11 U.S.C. § 1129(a)(3), is driven solely by its allegation that "the classification of the Depositors as an impaired class is artificial and a sham." This objection to the modified plan must therefore fail as well.

4. THE PLAN, AS MODIFIED, SATISFIES § 1129(a)(7) AND §§ 1129(b)(1), (b)(2)(A)(iii).

■ RTC's remaining objections relate solely to its own treatment under the Plan. It contends that the modified Plan fails to satisfy 11 U.S.C. § 1129(a)(7) because it fails to provide RTC with payment of its full debt of not only $583,256, but also interest and attorneys' fees which have accrued since the original confirmation date. By paying $2,500 monthly, the Debtor contemplates avoiding any future shortfall of interest and increases in the size of RTC's full debt. The Debtor's instant motion specifically requests that RTC be paid "the full amount of the allowed claim" on September 3, 1991, not merely $583,256. RTC's objection in this respect therefore does not appear well-taken.

The remaining objections are that the Plan is no longer accepted by all impaired classes; therefore, it cannot meet the requirement of 11 U.S.C. § 1129(a)(8); and hence, it cannot be confirmed under 11 U.S.C. §§ 1129(b)(1), (b)(2)(A), because the plan "is not 'fair and equitable' with respect to the RTC."

A plan can be confirmed over the objection of a class of secured creditors which has not accepted it, such as RTC, in the following circumstances, pursuant to 11 U.S.C. §§ 1129(b)(1), (b)(2)(A):

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a loan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, as is fair and equitable, with respect to each class of claims or interest that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such a claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of · the indubitable equivalent of such claims.

The foregoing language of § 1129(b) therefore provides that, with respect to a class of impaired secured claimants such as AFF/RTC, a plan may be considered to be "fair and equitable" if and only if it satisfies one of three alternative requirements of §§ 1129(b)(2)(A)(i), (ii), or (iii). As the language of the section clearly indicates by the use of the disjunctive, only one of these requirements must be met for the plan to be deemed "fair and equitable." *See In re Sandy Ridge Development Corp.*, 881 F.2d 1346, 1350, *reh'g denied*, 889 F.2d 663 (5th Cir.1989).

Since RTC will not retain AFF's original lien on the Debtor's property under the Debtor's Plan as modified, § 1129(b)(2)(A)(i) clearly does not apply.

Section 1129(b)(2)(A)(ii) also does not apply because, while the Plan proposes that the remaining proceeds from the sale be placed into a special account to assure RTC of the payment of its obligation, it does not provide for a sale free and clear of liens to McCracken and it does not propose that liens in favor of RTC attach to such funds.

■ We conclude, however, that § 1129(b)(2)(A)(iii) *does* apply and that the Debtor's plan is "fair and equitable" with respect to RTC because it provides RTC with the "indubitable equivalent" of its claim. Congress derived the term "indubitable equivalent" in the Bankruptcy Code from Judge Learned Hand's opinion in *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir.1935) ("*Murel*"). In *Murel*, Metropolitan Life Insurance Company ("Metropolitan") held a mortgage on an apartment house. The apartment house owners defaulted on the mortgage and Metropolitan attempted to foreclose. Metropolitan's

foreclosure action was stayed by the owners' filing of bankruptcy petitions. *Id.* at 942.

The owners proposed a plan requiring Metropolitan to forego amortization payments and to extend the due date of the mortgage while the building underwent renovation. Metropolitan would receive interest payments during this time but no payments on account of principal for ten (10) years. Metropolitan objected to the plan. *Id.* at 942. Judge Hand, acknowledging that the plan had little chance for success, held that the court had the power to confirm a plan over a creditor's objection if the plan provided "adequate protection for the realization by them of the full value of their interest, claims, or liens." *Id.* Judge Hand concluded that a secured creditor's right to "get money or at least his property" may be excluded from a plan only if that secured creditor receives a "substitute of the most *indubitable equivalence*." *Id.* (emphasis added). *See also In re American Mariner Industries, Inc.*, 734 F.2d 426, 433 (9th Cir.1984). Such "a substitute clearly must both compensate for present value and insure the safety of the principal." *Id.* The legislative history indicates Congress's intention that the phrase "indubitable equivalent" in § 1129(b)(2)(A)(iii) "follow the strict approach taken by Judge Learned Hand" in *Murel*. 4 CONG.REC. H1104 (daily ed. Sept. 28, 1978); and S.REP. NO. 989, *supra*, at 127, U.S.Code Cong. & Admin.News 1978, at 5913.

It is now incumbent upon us to decide if RTC will receive the "indubitable equivalent" of its claim under the Debtor's modified Plan. We conclude that it will. The modified Plan provides that, as of September 3, 1991, the secured claim of RTC will be paid off in full. This treatment is considerably better than even that of the Debtor's original Plan, which contemplated a reduction of AFF's claim to about $200,000, and provided that this remaining indebtedness would have been secured by residual realty with a value close to $1 million.

It cannot be forgotten that RTC's claim is grossly oversecured. The Debtor's plan

to pay off the entire balance of the secured claim, even moreso than its plan to reduce RTC's claim and increase the ratio of RTC's equity cushion, appears to allow RTC significant protection in the event that the modified plan would fail. In reviewing a proposed plan, the court in *In re Hollanger*, 15 B.R. 35, 46 (Bankr.W.D.La.1981), found the existence of certain factors, some of which are also present in our situation, persuasive to its finding that the proposed plan was "fair and equitable." These factors included the debtor's substantial equity in the property, about which the court stated that "[t]his large equity cushion offers substantial protection of the creditors' security," and the fact that the plan proposed to make some payments of principal to the claimant, unlike the plan in *Murel*.

The Debtor has very substantial equity in its property which provides RTC with a large equity cushion, which should be of great comfort to RTC. Further, the Debtor's modified Plan does not merely propose making principal payments to RTC; rather, it contemplates liquidation of RTC's claim entirely.

We do not share RTC's skepticism regarding the Debtor's chances for performance according to the modified Plan. But, even if we did, it is apparent that the large equity cushion of RTC will be a failsafe for it in the event that the modified Plan fails.

Section 1129(b)(2)(A)(iii) requires that the secured creditor receive the "indubitable equivalent" of its *claim*, not the "indubitable equivalent" of its original collateral. It is irrelevant that RTC's collateral, after the confirmation of the Debtor's modified Plan, is not an exact substitute for the collateral that it holds at present, prior to the sale. Clearly, the Debtor will own less realty after its sale to McCracken than it does before the sale, causing the value of the property on which RTC holds a security interest to be reduced. However, all that is required by § 1129(b)(2)(A)(iii) is that the creditor receive the indubitable equivalent of its claim. A cash payment of its claim in full is unquestionably the equivalent or better of RTC's retention of the full measure of its security interest in the Debtor's realty.

### D. CONCLUSION

Having concluded that the Debtor's modified Plan complies with all of the provisions of §§ 1129(a) and (b)(2), including those to which RTC specifically objects, we are prepared to grant the Debtor's motion to further modify its confirmed Plan. An appropriate Order will follow.