**In re Ellen J. CALVANESE, Debtor.**

**Bankruptcy No. 93–14839DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

June 15, 1994.

Matthew H. Krekstein, Abraham Pressman & Bauer, P.C., Philadelphia, PA, for debtor.

Jay E. Kivitz, Kivitz & Kivitz, P.C., Philadelphia, PA, for G.E. Capital Mortg. Corp.

Robert W. Sayre, Saul, Ewing, Remick & Saul, Philadelphia, PA, for United Valley Bank.

Joseph Goldbeck, Jr., Philadelphia, PA, for Wendover Funding, Inc.

W.B. Sanderson, Malvern, PA, for Corestates Bank.

John B. Herron, Malvern, PA, for Bank of New York.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court in the individual voluntary Chapter 11 bankruptcy case of ELLEN J. CALVANESE ("the Debtor") are (1) the Debtor's request that we confirm her Amended Plan of Reorganization, As Further Modified ("the Plan") over the opposition of the first mortgagee of her residential realty, G.E. Capital Mortgage Corp. ("G.E."); and (2) G.E.'s Motion for Relief from the Automatic Stay ("the Relief Motion") seeking to foreclose upon that residential realty, situated at 8 Christopher Drive, Abington, Pennsylvania 19001 ("the Home"), and owned jointly with her husband, the sole mortgagor to G.E., Carmen J. Calvanese ("Carmen").

We conclude that the Plan cannot be confirmed, principally because it is not feasible and because it does not treat G.E.'s secured claim in a fair and equitable manner. Although we will give the Debtor one last chance to propose a confirmable plan, we find that G.E. already has had to wait several years to foreclose on the Home despite the complete absence of payments. Therefore, we will grant the Relief Motion.

## B.  FACTUAL AND PROCEDURAL HISTORY

This case was filed on August 18, 1993.  It was preceded by a case filed under Chapter 11 by Carmen on August 17, 1990, along with several other entities holding title to Carmen's then-significant real estate holdings.  Carmen's case, Bankr. No. 90–13399DAS, was ultimately converted to a Chapter 7 case on October 2, 1991, and was closed, after his discharge, on November 4, 1992.  The automatic stay arising from Carmen's case held up any efforts of G.E. to foreclose upon the Home for over two years.

On November 8, 1993, G.E. filed the Relief Motion.  A hearing on the Relief Motion was initially scheduled on December 14, 1993, but was continued by agreement of the parties until January 5, 1994.  After the January 5, 1994, hearing, we entered an Order of January 6, 1994 ("the January Order"), stating in pertinent part as follows:

1.  The continuation of the automatic stay, as to the [Home] is conditioned on the following:

a.  The Debtor shall file a viable Plan and a proposed Disclosure Statement and serve notice of the Disclosure Statement filing upon all parties on or before January 28, 1994.

b.  The Debtor shall schedule a hearing on the Disclosure Statement, to be held on the same day as a continued hearing on [G.E.'s] Motion on ... February 23, 1994, ...

c.  The Debtor shall demonstrate at the hearing on February 23, 1994, that the ... Plan proposed has at least a probability of confirmation.

2.  If the Debtor fails to satisfy any of the foregoing conditions, or if confirmation of the plan is denied, it is anticipated that [G.E.] will be granted immediate relief from the stay as to the [Home] unless cause not to do so is proven by the Debtor.

The Relief Motion was thereafter carried with the hearings on disclosure statements and on confirmation thereafter in conjunction with Debtor's protracted path to the confirmation hearing on the Plan before us.

The Debtor filed the initial version of her plan and an accompanying disclosure statement on the January 28, 1994, deadline date.  A hearing was held on the disclosure statement on February 23, 1994.  After the Debtor made certain amendments to the disclosure statement and plan, we approved the disclosure statement on March 8, 1994.

We initially scheduled a confirmation hearing on this version of the Plan on April 27, 1994.  G.E. filed objections to confirmation of this plan on April 15, 1994.  The Debtor filed a report of plan voting which indicated that all votes on the plan rejected it.  At the hearing, the Debtor nevertheless advised the court that she had managed to strike deals with many of the objecting creditors and would amend the plan to serve to memorialize these agreements.  Thus, at the Debtor's request, we continued the confirmation hearing to May 4, 1994, in order to give the Debtor an opportunity to file a motion to permit certain creditors to belatedly cast or change their votes in light of the plan amendments and listed that motion for May 4, 1994, also.

We conducted the confirmation hearing on May 4, 1994, as scheduled.  However, we found that the Debtor's motion regarding changes in votes had not clearly described the amendments to the plan, nor precisely identified those creditors who sought to change their votes.  After that hearing, we therefore entered an Order of May 5, 1994, requiring the Debtor to file a comprehensible motion to amend the plan and to allow specific creditors to either vote late or change their votes by May 9, 1994, and providing both the Debtor and G.E. with an opportunity to file Briefs in support of their respective positions as to confirmation of the final amended plan by May 20, 1994.  A final hearing on any motion filed and the confirmation hearing on any amended plan filed was re-scheduled on May 25, 1994.  The Debtor did file an amended plan, a motion to change votes, and an amended report of plan voting.  However, only G.E. accepted our invitation to file a pre-hearing brief on confirmation issues.

At the May 25 hearing, we granted, without opposition, the Debtor's motion to amend the plan and have the votes recalculated.  At

this point, all votes necessary for consensual confirmation except that of G.E. were received. At the hearing, we remarked that we found the plan to be ambiguous regarding the Debtor's declarations as to how she and her family would proceed if the Home were not sold as of December 31, 1994, *e.g.*, did the Debtor and her family merely agree to move out or was she contemplating allowing G.E. to take title and possession at that time? *See* page 109 *infra.*

In an Order of May 26, 1994, we allowed the Debtor a further opportunity to file another amended plan and a brief supporting its confirmation by June 3, 1994, and allowed G.E. until June 10, 1994, to reply. The Debtor filed the Plan before us, and, as to the ambiguity noted above, clarified that she and her family contemplated only unconditionally moving out of the Home as of December 31, 1994. Both parties timely filed additional briefs.

## C. DISCUSSION

### 1. THE PLAN CANNOT BE CONFIRMED

#### a. *The Plan Is Not Feasible*

■  Section 1129(a)(11) of the Bankruptcy Code provides that a court shall confirm a plan only if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." The purpose of this so-called feasibility requirement is to "prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." 5 COLLIER ON BANKRUPTCY, ¶ 1129.02[11], at 1129–59 (15th ed. 1993). *Accord, In re Pizza of Hawaii, Inc.,* 761 F.2d 1374, 1382 (9th Cir.1985); and *In re Orlando Investors, L.P.,* 103 B.R. 593, 600 (Bankr.E.D.Pa.1989). Although § 1129(a)(11) recognizes the possibility of liquidating plans, a planned liquidation does not create an exception to the feasibility requirement. Even liquidating plans must be feasible. Indeed, many of the cases discussing the feasibility issue arise in the context of liquidating plans much like the Plan in this case.

■  The Debtor's first plan provided that the Debtor would be given until December 1, 1994, to sell the Home. No payments were scheduled to be made to G.E., which has not received a payment since May, 1990, prior to the sale. If the sale were not consummated by December 1, 1994, the Debtor and her family nevertheless agreed to vacate the Home by December 31, 1994. During the plan process, the Debtor sought to move the sale deadline and deadline for vacating the Home back to March 1, 1995, and March 31, 1995, respectively. At the court's suggestion that no later dates would be tolerated, the Debtor, in the present Plan, has now set the date on which the sale must be consummated and the date that the Debtor and her family would vacate the Home at December 31, 1994.

The Plan still does not provide for any payments to G.E. Also, although the amendment deleted a former provision that the automatic stay would remain in place indefinitely post-confirmation, the Plan makes it very clear that the Debtor and Carmen do not plan to capitulate to G.E. in a pending state foreclosure action. Thus, the Debtor is effectively seeking to hold G.E. in abeyance while she and her husband are accorded an additional undisturbed five months or so to sell the Home. Thereafter, although the Debtor and her family will vacate the Home, they apparently anticipate holding G.E. at bay in a foreclosure action while they make further attempts to market the Home. This proposal must be viewed in light of the fact that the Debtor and Carmen have had the Home on and off the market several times since 1990, the only constant being their failure to make any mortgage payments to G.E. over this period.

In the clear majority of cases considering such or similar plans, bankruptcy courts have refused to confirm plans which keep creditors "on hold" without receipt of payments while the debtor seeks to sell real estate which it has been unable to sell in years past. Generally, these courts point out that such plans are nothing more than speculative ventures which place all the risk on the respec-

tive secured creditors, and, therefore, are not feasible. For example, in *In re Orlando,* 53 B.R. 245 (Bankr.W.D.Mo.1985), the debtor proposed a plan of reorganization which would allow it at least two years, and possibly an indefinite period of time, to market and sell its real estate. *Id.* at 246. At the same time, the Plan did not provide for any adequate protection payments to any of the secured creditors. *Id.* Secured creditors would only be paid if and when the real estate was sold. *Id.* at 247–48. The court acknowledged that "when there is a *considerable* equity in mortgaged property and it can be sold *within a short period of time,* the debtors, without according any adequate protection, might be permitted that *short period of time* in which to sell the property." *Id.* at 249 (emphasis added). The court determined that the case before it was not one of those "imaginable cases in which the equity . . . so obviously protects the secured creditors so completely that any other adequate protection is not necessary." *Id.* Thus, the court refused to reconsider a prior order converting the debtor's Chapter 11 case to Chapter 7.

Similarly, in a case before Bankruptcy Judge Fox of our district, *In re Factor & McCabe,* Bankr. No. 89–12547F (Bankr. E.D.Pa. Dec. 20, 1990), a debtor partnership filed a plan of reorganization which proposed to give the debtor approximately six months to market and sell its only asset, a commercial property located in Center City Philadelphia. *Id.* at 3. The Debtor had been trying, without success, to sell the property for a number of years. *Id.* at 2–3. The minority partner of the Debtor objected to confirmation asserting, *inter alia,* that the Plan was not feasible. The court reviewed the Debtor's past unsuccessful attempts to sell the property and concluded that "the debtor has not demonstrated that its proposed plan of a prompt sale of its realty is reasonably likely to occur." *Id.* at 6. Thus, the court concluded that the Debtor's Plan "did not meet the feasibility requirement of section 1129(a)(11)." *Id.* Accord, *In re South Ai-*

*ken, Ltd.,* 121 B.R. 7, 9 (Bankr.W.D.Pa.1990) (court would not confirm, in preference to a creditor's competing plan, a debtor's plan of reorganization which provided for the immediate liquidation of the Debtor's sole asset, where the debtor's plan would "hold the case in abeyance" for up to two years while the Debtor attempted to market and sell its office building); *In re Krueger,* 66 B.R. 463, 464–65 (Bankr.S.D.Fla.1986) (a plan which provided for full payment to creditors from proceeds of a sale of real estate at some undetermined time in the future would not be confirmed, especially when the Debtor's marketing efforts as of confirmation had not resulted in an offer sufficient to pay the mortgage on the property, much less other creditors); *In re Trail's End Lodge, Inc.,* 54 B.R. 898, 900, 904 (Bankr.D.Vt.1985) (a plan which would be sufficiently funded only if a proposed asset sale occurred in the near future and yielded "top dollar" would not be confirmed in light of the Debtor's demonstrated inability to sell the assets in the current market); *In re Hoffman,* 52 B.R. 212, 214–15 (Bankr.D.N.D.1985) (a plan was found not feasible because it was funded by a sale of assets which was neither certain to occur in the two years provided, nor certain to generate sufficient proceeds even if it did occur); and *In re Stuart Motel, Inc.,* 8 B.R. 48, 49–50 (Bankr.S.D.Fla.1980) (the Debtor was not permitted to operate its hotel for 90 days pursuant to its plan while attempting to sell unrelated real estate in order to pay its creditors). *Cf. In re Haardt,* 65 B.R. 697, 700–02 (Bankr.E.D.Pa.1986) (Fox, J.) (a plan which provided for a refinancing "as soon as feasible" after confirmation in order to take out a secured creditor was deemed not feasible, especially since "there [is no] evidence explaining why Debtor has been unable to obtain financing since filing this bankruptcy almost two (2) years ago or why this Court should conclude that Debtor will be able to accomplish in the next one hundred twenty (120) days what she has not been able to do in the previous two (2) years.").[1]

---

1. We have found only two cases in which plans supported by future sales of real estate were confirmed. In both cases, the confirming courts required additional indicia of feasibility. *See In re Mt. Vernon Plaza Community Urban Redevelopment Corp. I,* 79 B.R. 306, 309–10 (Bankr. S.D.Ohio 1987) (prospective buyer identified and prospective buyer's financing deemed likely);

The parallels between the Debtor's case and the cases discussed above are striking. The Debtor, through the efforts of Carmen, has been trying to market and sell the Home, at least intermittently, for some time. The only offer seriously considered was made in September, 1991, and was for $550,000, less than half of the current asking price. G.E. will receive no payments post-confirmation until the sale. And, although the Debtor asks for only six months to sell the Property, as opposed to the longer periods contemplated in many of the plans rejected by the courts cited above, there is at least one case that has held that even 90 days is too long of a "waiting period" for creditors in such plans. *See Stuart Motel, supra,* 8 B.R. at 49–50.

This court acknowledges that it has rarely denied confirmation of a plan on the ground of lack of feasibility. As we stated in *In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991),

> [t]he standards for determining plan feasibility are not rigorous. *See, e.g., In re Temple Zion,* 125 B.R. 910, 914 (Bankr. E.D.Pa.1991); *In re 222 Liberty Associates,* 108 B.R. 971, 985–86 (Bankr.E.D.Pa. 1990); *In re Orlando Investors, L.P.,* 103 B.R. 593, 600 (Bankr.E.D.Pa.1989); and 5 COLLIER ON BANKRUPTCY, ¶ 1129.-2(11) [sic], at 1129–39.11.
>
> > "Caselaw has established that bankruptcy court[s] must consider several factors in making a feasibility determination: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any the related matters which determine the prospects of a sufficiently successful operations to enable performance of the provisions of the plan. *See, e.g., 222 Liberty Associates,* 108 B.R. at 986, *In re Gulph Woods Corp.,* 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd,* C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re*

*Landmark of Plaza Park, Ltd.,* 7 B.R. 653, 659 (Bankr.D.N.J.1980)."

*Temple Zion, supra,* 125 B.R. at 915.

The application of many of the six "classic feasibility factors" to the state of affairs surrounding the instant consumer-debtor is somewhat awkward, but instructive. She has no "capital structure." She is a housewife who is not exhibiting "earning power." Her financial affairs are rather obviously "managed" by Carmen, whose abilities have not been able to withstand recent adverse economic conditions in the real-estate market in reference to his once-considerable real estate holdings.

What the courts which have analyzed similar "wait and sell" plans have appeared to almost uniformly conclude is that, unless an immediate sale or other development which will benefit an objecting creditor is not only clearly defined but also is imminently likely to transpire, the plan will be deemed infeasible.

The instant plan is clear as to only the time deadlines for the sale to occur and for the Debtor and her family to vacate the Home. G.E. has obviously concluded that its benefit from these developments is insufficient to merit its support. It has hinted that, if the Debtor agreed to transfer title to the Home to it by the end of 1994, as well as give up possession to it by that date, it might consider those benefits sufficient to merit its support. However, despite the court's suggestion that the Plan include title-transfer provisions, it clearly does not. After the discussion between the court and the Debtor's counsel regarding this point, this omission is clearly not attributable to oversight.

We therefore doubt that the "classic feasibility factors" have been proven by the Debtor to be present here. There is therefore ample authority for finding the Plan non-confirmable as infeasible, and there is little authority, if any, supporting the opposite result.

This court also believes that the same deficiencies of the Plan can be analyzed under

---

and *In re Timber Tracts, Inc.,* 70 B.R. 773, 777–78 (Bankr.D.Mont.1987) (the debtor had a proven "track record" of sales, and the plan included

an alternative capital infusion provision). We find no such additional indicia of feasibility relative to the Plan now before us.

the cram down requirements of 11 U.S.C. §§ 1129(b)(1), (b)(2), as well as the feasibility requirements of 11 U.S.C. § 1129(a)(11).

### b. *The Plan Is Not Fair and Equitable*

■ Since the secured claim of G.E. is impaired and G.E. has voted against the Plan, the Debtor cannot meet the requirements of 11 U.S.C. § 1129(a)(8) and must "cram down" G.E. pursuant to 11 U.S.C. § 1129(b) in order to confirm her Plan. In pertinent part, §§ 1129(b)(1), (b)(2)(A)(i), (iii) provide as follows:

> (b)(1) ... if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to the plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

> (2) For the purposes of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

> (A) With respect to a class of secured claims, the plan provides—

> (i)(I) that the holder of such claims retain the liens securing such claims ... to the extent of the allowed amount of such claims; and

> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totalling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such

holder's interest in the estate's interest in such property; or ...

> (iii) for the realization by such holders of the indubitable equivalent of such claims.

G.E. asserts that Debtor cannot successfully invoke § 1129(b)(2) because the Plan's complete deferral of G.E.'s principal and interest payments, and the resulting short but severe negative amortization, is not fair and equitable to it. Furthermore, G.E. alleges that the Plan unfairly discriminates between its claim and the claims of the other secured creditors. The agreements reached by the Debtor with the other secured creditors, which are not, as this court had directed, included in the Plan, apparently contemplates that the second mortgagee on the Home, United Valley Bank, will receive payments of $1,000 monthly from March, 1994, forward and that Wendover Funding, taken over by the Resolution Trust Co. ("the RTC"), will receive its regular monthly payments of $557.67 on its mortgage on a condominium unit also owned by the Debtor and Carmen beginning in May, 1994. The Plan provides that unsecured creditors, apparently including a third mortgagee on the Home, Hanson Savings Bank, which has also been taken over by the RTC, will receive fifteen (15%) percent of their claims by the end of 1994. Hence, G.E., a senior creditor, will thus receive nothing unless the Home is sold, while junior creditors will be paid at least modest sums certain under the Plan.[2]

■ Because G.E. will not be paid unless and until the Home is sold, the complete deferral of the principal and interest payments provided for in its loan documents constitutes, as noted above, a short but severe negative amortization of its loan bal-

---

**2.** The "unfair discrimination" requirement of § 1129(b)(1) is not defined. Some courts have interpreted the phrase, consistent with the legislative history of this provision, as the embodiment of the absolute priority rule. *See* 5 COLLIER ON BANKRUPTCY, ¶ 1129.03[3][b], at 1129–77 to 1129–79 (15th ed. 1993). This embodiment of the absolute priority rule arguably would apply to all classes of claims and not just classes of unsecured creditors. If it were otherwise, the requirement of "unfair discrimination" would be entirely duplicative of the "fair and equitable" requirement for unsecured creditors

that is clearly a codification of the absolute priority rule appearing in 11 U.S.C. § 1129(b)(2)(B)(ii). And yet, comparing the treatments of two or more secured claims for the purposes of an absolute priority determination might well be like comparing apples and oranges. *See In re Custer,* 1993 WL 7965, slip op. at *7 (Bankr.E.D.Pa. Jan. 7, 1993) ("[T]he [absolute priority rule] does not strictly apply to secured creditors...."); and *In re 641 Associates, Ltd.,* 140 B.R. 619, 628–30 (Bankr.E.D.Pa.1992) (same).

ance. Because complete deferral of payments with a balloon payment at the end of the term may technically comply with the requirement of § 1129(b)(2)(A)(i), a negative amortization feature proposed in a plan of reorganization is not *per se* impermissible. *See Great Western Bank v. Sierra Woods Group,* 953 F.2d 1174, 1177–78 (9th Cir.1992); *In re Wynnefield Manor Associates, L.P.,* 163 B.R. 53, 59 (Bankr.E.D.Pa.1993); *641 Associates, supra,* 140 B.R. at 630–31; and *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 398 (Bankr.W.D.Tenn.1991).[3] In *Wynnefield Manor, supra,* 163 B.R. at 59, and *641 Associates, supra,* 140 B.R. at 630–31, we adopted the following ten-question test articulated by the *Great Western* and *Apple Tree* courts for determining whether a negative amortization feature in a plan is "fair and equitable" for purposes of § 1129(b)(1):

1. Does the plan offer a market rate of interest and present value of the deferred payments;

2. Is the amount and length of the proposed deferral reasonable;

3. Is the ratio of the debt to value satisfactory throughout the plan;

4. Are the debtor's financial projections reasonable and sufficiently proven, or is the plan feasible;

5. What is the nature of the collateral, and is the value of the collateral appreciating, depreciating or stable;

6. Are the risks unduly shifted to the creditor;

7. Are the risks borne by one secured creditor or class of secured creditors;

8. Does the plan preclude the secured creditor's foreclosure;

9. Did the original loan terms provide for negative amortization; and

10. Are there adequate safeguards to protect the secured creditor against plan failure.

Unfortunately for the Debtor, her Plan does not fare well when scrutinized under the lens of the above ten-part test. Because the Plan proposes to pay G.E. in full at the contract rate of interest, element one of the test is satisfied. The Debtor partially satisfies element two. The length of the deferment (approximately five months) would normally not be considered unreasonable. However, complete deferment of both principal and interest, especially when other creditors will receive interim payments, does not appear reasonable at all.

Whether the Debtor has satisfied element three is uncertain. The testimony of Carmen, valuing the Home at $1.4 million yet indicating a willingness to accept $550,000 for it less than three years ago, leaves a range of possibilities regarding the potential equity of the Debtor and her husband in the Home, given G.E.'s present debt of about $770,000, from approximately $630,000 on the one hand to negative $220,000 on the other. The testimony of G.E.'s expert, valuing the Home at $760,000, appears about right and supports the conclusion that, if pressed to decide the issue, it would be appropriate for us to conclude that the Home will be worth approximately the same amount as G.E.'s mounting debt as of the crucial date of confirmation. Therefore, the Debtor's equity "cushion," if any, is minimal.

Passing on to element four, we find that the Debtor has provided no evidence supporting her hope that she can sell the Home by December 31, 1994, "drop dead" date in an amount sufficient to retire the secured debt. Furthermore, as concluded in our discussion at pages 107–09 *supra,* the Plan is at least of questionable feasibility. Therefore, Debtor has not satisfied element four of the test. As to element five, we find that the collateral, a large, distinctive home newly built in the Victorian style, which appears somewhat out of place in its neighborhood, is possibly depreciating in value or, at best, maintaining its present value. Thus, the Debtor is not aided by element five.

Elements six and seven of the test clearly weigh against the Plan. Most of the risk of

---

**3.** A plan containing a negative amortization provision may also run afoul of the feasibility requirement of 11 U.S.C. § 1129(a)(11). *See, e.g., In re M & S Associates, Ltd.,* 138 B.R. 845, 850–

51 (Bankr.W.D.Tex.1992). This is more likely to be the case in those instances where the length of the deferral is great.

the Plan is placed on the shoulders of G.E. Clearly, G.E. is expected to bear more of the risk than the junior secured and unsecured creditors, who will at least receive interim and/or partial payments.

Element eight is probably the most telling of the test's ten elements. As we have pointed out at page 109 *supra*, the Plan does not provide for a deed in lieu of foreclosure or a friendly foreclosure in the event that the sale contingency fails, despite this court's suggestion that the exclusion of such a provision could be critical to the Plan's success. Thus, after six months of being held at bay, G.E. might ultimately find itself in a protracted foreclosure litigation in the state court[4] and no closer to foreclosure (or in any way better off) than it was at the start of the case. *See 641 Associates, supra*, 140 B.R. at 631 ("If the Plan allows a secured creditor to obtain swift redress in the event of dismal performance by a debtor, as opposed to locking in a secured creditor without adequate returns on its security or redress in the event of default for an extended period, a court should properly feel more comfortable about allowing a negative amortization feature in a plan."). *Cf. Hoffman, supra*, 52 B.R. at 215 (a future sale plan is found not feasible, especially in light of the debtor's failure to provide contingent treatment of secured creditor's claim if a sale never materializes).

G.E.'s original loan terms did not provide for negative amortization, and, therefore, the Debtor is also stung by element nine of the test.[5] Finally, as noted above at our discussion of element eight, the Plan does not provide adequate, contingent treatment of G.E.'s claim in the event the Debtor cannot sell the Property, so element ten is not met either.

All in all, the short duration of the deferment makes this analysis a closer call than a review of the ten elements would, at first blush, seem to suggest. *Compare Orfa Corp., supra*, 129 B.R. at 419–21 (with an interest rate adjustment, a plan's negative amortization feature would be tolerated given the reasonably short period of deferment), *with 222 Liberty Associates, supra*, 108 B.R. at 995; *In re Memphis Partners, L.P.*, 99 B.R. 385, 387–88 (Bankr.M.D.Tenn.1989); and *In re Spanish Lake Associates*, 92 B.R. 875, 878–79 (Bankr.E.D.Mo.1988) (all holding that negative amortization plans are not fair and equitable, mainly because the payments are deferred for too long of a period). Although, in the final analysis, we conclude that the Plan fails the fair and equitable test for negative amortization plans, the short duration of the amortization period causes us to note that it does not miss the mark by all that much.

By way of comparison, we observe that a plan contemplating a sale of certain realty of the debtor at issue in *In re Rota*, 1990 WL 90968 (Bankr.E.D.Pa. June 26, 1990), was found to be fair and equitable to the secured creditors. *Id.* at *5. In that case, the Debtor sought to defer all principal and interest payments to its two secured creditors on that

---

4. The Debtor objects to G.E.'s discussion of the status of the state court foreclosure action in its brief because evidence pertaining to that action was not entered into the record at the confirmation hearing. Regardless, it is clear that the Plan does not provide for the voluntary transfer of title in the event that the Debtor is unable to sell the Home. Therefore, G.E. will have no choice but to resort to a foreclosure action in state court to obtain title to the Home. Because there is no evidence that the Debtor would consent to such relief, and she has expressly declined to put such a provision in her Plan in the face of the court's suggestion that she so do, we can only assume that it is significant to the Debtor to retain her interest in the Home, and that the state court action would be contested.

5. Again, the Debtor argues that we should disregard G.E.'s assertions that its loan does not provide for negative amortization because G.E. never entered its mortgage into evidence. In fact, the Debtor herself entered G.E.'s mortgage into evidence as an exhibit to G.E.'s proof of claim marked Debtor's Exhibit D–3. The mortgage does not, however, indicate G.E.'s rate of interest. That information, presumably, is contained in G.E.'s mortgage note which is not part of the record. However, the Plan states that "[i]f the Debtor sells the Home on or before December 31, 1994 ... G.E. shall be paid in full, including contract interest...." Furthermore, an employee of G.E., Charles E. Lynch, testified that the Debtor's "annual percentage rate" is 11.125%, amounting to "approximately $53,000 a year in interest." Notes of Testimony from Hearing Conducted on May 4, 1994, at 59. Thus, we can determine, with a fair amount of certainty, that the mortgage note does not defer, in whole or part, the payment of interest.

property for approximately one year while he attempted to sell or develop certain real property. *Id.* However, the property to be sold was not, as is the case here, the greater part of the Debtor's assets. *Id.* at *4. Also, the Debtor had a distinct business plan, which this court accepted as realistic, in reference to that property. *Id.* at *2. Most important to the issue at hand, the *Rota* Debtor was directed to modify its plan to include a provision by which the Debtor would be obligated to turn over the properties to the secured creditors by way of deeds in lieu of foreclosure in the event that he was unable to sell the properties by the end of the first Plan year. *Id.* at *5. In that context, we found the secured creditors' fair and equitable objection unpersuasive, holding that "[h]ere ... interest at the contract rate and principal are deferred for but one year at the most, during which [time the secured creditors] will either be paid in full *or the collateral will be turned over to [them].* The value of the collateral is good and expected to remain fairly stable for the foreseeable future." *Id.* at *6 (emphasis added). Thus, if the Debtor would have been willing to turn over the Home to G.E. should the five-month marketing period lapse unsuccessfully, the Plan very well might have survived G.E.'s challenge. It might also have garnered G.E.'s support.

■ Finally, we address G.E.'s unfair discrimination objection. Whether this objection is a call to apply the absolute priority rule, *see* page 110 n. 2 *supra*, or a resort to the amorphous principles of fairness contained in the preamble of § 1129(b), *see Custer, supra*, slip op. at *7, a court may deny confirmation of a plan of reorganization if it unfairly provides preferential treatment to a secured creditor with a lien on the same collateral subordinate to the senior secured creditor of that collateral. *See, e.g., In re Nelson*, 133 B.R. 786, 791–94 (Bankr. S.D.Miss.1991); and *In re Dilts*, 100 B.R. 759, 761–62 (Bankr.W.D.Pa.1989), *reconsidered*, 126 B.R. 470 (Bankr.W.D.Pa.1991). In this case, it is doubtful that there is equity in the Home for the junior secured creditors. In light of the complete deferral of G.E.'s payments, this value deficiency will become more pronounced as time passes. If the Home cannot be sold for an amount equaling the full amount of G.E.'s claim, it does indeed seem unfair that junior creditors already will have received cash payments on what has turned out to be unsecured claims prior to G.E. For this reason, we find that the Plan also fails the "fair and equitable" requirement of § 1129(b).

c. *Miscellaneous Objections*

(i) *The Plan violates 11 U.S.C. § 546(a)*

■ In Section VIII of the Plan, the Debtor reserves the "right" to bring all causes of action under several sections in Chapter 5 of the Bankruptcy Code, including §§ 544, 547 and 548, and provides that any such recoveries "will belong to the Debtor and will not be part of the estate." This section of the Plan further provides that "[t]he Debtor shall have until the time the Case is closed or dismissed to bring any action against any party pursuant to Section 546(a)(2) of the Code."

The Debtor's reference to § 546 is incomplete and may seek to change the effect of 11 U.S.C. § 546(a) insofar as that Code section provides that "[a]n action or proceeding under section 544, ... 547, [or] 548 ... of this title may not be commenced after the earlier of—(1) two years after the appointment of a trustee under section ... 1104 [or] 1163 ... of this title; or (2) the time the case is closed or dismissed." It is true that there has been, in the past, a split of non-controlling authorities as to whether subsection (1) of § 546(a) applies to a debtor in possession in light of its reference to "the trustee" only. This debate has, however, been settled by a controlling precedent in the Third Circuit in *In re Coastal Group, Inc.*, 13 F.3d 81 (3d Cir. 1994). In that case, the Court of Appeals held that the limitation period of § 546(a)(1) applies to both trustees and debtors in possession. *Id.* at 83–86. The Debtor's Chapter 11 bankruptcy was filed on August 18, 1993. Thus, the two year limitation of § 546(a)(1) will run on August 18, 1995, a date which may fall before this case is closed or dismissed.

■ As we have held in the past, *see In re Frascatore*, 98 B.R. 710, 718–19 (Bankr.

E.D.Pa.1989), § 546(a)(1) is a statute of repose. Thus, unlike a statute of limitations which must be raised as a defense after the suit is filed and can be waived if not raised, § 546(a)(1) forbids the filing of a suit after the applicable limitation period has run. Therefore, the Debtor's Plan, to be confirmable, would have to be modified to limit the Debtor's right to bring causes of action under §§ 544, 547 and 548 in accordance with § 546(a)(2) *and* (a)(1).

### (ii) *Section VIII of the Plan is contrary to the Bankruptcy Code*

■■■ Related to the preceding objection, but not raised by G.E.,[6] is the Debtor's attempt to reserve for herself any recovery secured by her potential §§ 547 (preference), 548 (fraudulent conveyance), 542 and 543 (turnover), 544 (strong arm avoidance) and 549 (postpetition transfer avoidance) actions by the provision that "[a]ny recovery ... will belong to the Debtor and will not be part of the estate." The Bankruptcy Code sections listed above are intended to provide a means to augment a Debtor's estate for the benefit of all creditors, not to provide a windfall for a Debtor.[7] A hypothetical involving § 547 illustrates the inequity of the Plan as drafted.

Section 547 allows a trustee or a debtor in possession to recover certain *otherwise legitimate* payments made by the Debtor to its creditors on the eve of the Debtor's bankruptcy. The purpose of this Code section is to prevent creditors from dismembering a debtor at the first sign of financial difficulty, thus expediting the Debtor's ultimate demise. The preference section is also intended to ensure equal distribution of the Debtor's sometimes meager assets among its several creditors. If the Debtor in this case were allowed to utilize § 547 to undo otherwise valid debt payments and then keep the money herself, while at the same time discharging the creditors' underlying claims, no policy reason would be served whatsoever. Such a mischievous result would prompt debtors to pay as many creditors as possible on the eve of bankruptcy, file bankruptcies, confirm plans which pay little or nothing to the unsecured creditors, and personally reap the recoveries of their § 547 actions. This scenario would effectively allow assets to slip through the Debtor's estate altogether and land in the pocket of the Debtor. A Plan section so providing cannot be tolerated, and a plan containing such provisions is inconsistent with the Code and cannot be confirmed under 11 U.S.C. § 1129(a)(1).

G.E.'s remaining Plan objections have either been addressed by the Debtor, lack merit, or are picayune and would not, standing alone, prevent confirmation of the Plan.

### 2. G.E. IS ENTITLED TO RELIEF FROM THE AUTOMATIC STAY

■■■ After the hearing of January 5, 1994, on the Relief Motion, we entered the January Order, which continued the automatic stay in place only on the conditions that Debtor promptly file and confirm a plan of reorganization. *See* pages 2–3 *supra*.

As discussed above, the Debtor's Plan cannot be confirmed, despite our providing the Debtor with two opportunities to amend the Plan in light of this court's suggestions. *See* pages 106–07 *supra*. Nor has the Debtor shown us any reason why we should not grant G.E. relief from the automatic stay. The Debtor and Carmen have had ample time to market and sell the Home to date. There is evidence that the Home was placed on and then taken off the market several times and was not listed with any broker or multiple-listing service as late as during the pendency of this case. The foregoing fact suggests an understandable, but in this context intolerable, attempt of the Debtor and

---

**6.** Despite G.E.'s failure to raise this objection, we may nonetheless consider it because bankruptcy courts have an independent duty to ensure that a plan of reorganization meets all of the requirements of confirmation, even in the absence of an objection by a party in interest. *See In re Union Meeting Partners,* 165 B.R. 553, 574 (Bankr. E.D.Pa.1994).

**7.** This self-serving Plan provision is, however, consistent with the general tenor of the Plan. For example, the Debtor also reserves to herself any proceeds from the sale of the Home which remain after all Plan payments are made even though the unsecured creditors are not to be paid in full under the Plan. The unsecured creditors could have objected to this absolute priority violation but did not.

Carmen to cling to their unique and obviously emotionally-prized Home.

However, it must be recalled that there have been no recent acceptable purchase offers for the Home. The only offer mentioned as seriously considered was for $550,000, a figure which it is not clear that G.E., as well as the Debtor and her husband, would find acceptable. The Debtor has not indicated that any other offer is pending, or even expected. Indeed, it is not clear that, even now, the Debtor has signed a listing agreement with a real estate broker. In sum, there is no indication that Debtor and Carmen are any closer to selling the Home today than they were at the beginning of this case, or the beginning of Carmen's case in August, 1990. It would be unfair to make G.E. wait any longer. Certainly, cause exists warranting the lifting of the automatic stay pursuant to § 362(d)(1) under these circumstances.

Therefore, although we will allow the Debtor to make one more effort to produce a confirmable plan, we will no longer withhold unconditional relief from the stay from G.E. on the condition of the production and solicitation of such a plan.

### D. CONCLUSION

An Order consistent with the conclusions reached in this Opinion will be entered.

### ORDER

AND NOW, this 15th day of June, 1994, after hearings on May 4, 1994, and May 25, 1994, to consider whether we should confirm the Amended Plan of Reorganization, As. Further Modified ("the Plan") and its predecessors proposed by ELLEN J. CALVANESE ("the Debtor") over the Objections of G.E. Capital Mortgage Services, Inc. ("G.E.") thereto; upon consideration of the record from these hearings and that from a hearing on January 5, 1994, on G.E.'s Motion for Relief from the Automatic Stay ("the Relief Motion") consolidated therein; and upon consideration of the Briefs submitted by the parties relevant to these matters, it is hereby ORDERED AND DECREED as follows:

1. Confirmation of the Plan is DENIED.

2. The Relief Motion is GRANTED.

3. The Debtor may file one further Amended Plan consistent with the accompanying Opinion, along with an Amended Disclosure Statement, or supplement to her prior disclosure statement, describing the changes from her prior Plan. If Debtor chooses to file an Amended Plan and Disclosure Statement or supplement, she shall serve black-lined copies of same upon counsel listed below and the court in chambers, and she shall notify all interested parties of the filing of the Amended Disclosure Statement or supplement to the prior Disclosure Statement on or before June 24, 1994.

4. A hearing on the adequacy of the Amended Disclosure statement or supplement filed is scheduled on

WEDNESDAY, JULY 20, 1994, at 9:30 A.M. and shall be held in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

5. If no further Amended Plan is filed and served as directed herein, this case will be converted to a Chapter 7 case without any further notice or hearing. The case may also be converted to a Chapter 7 case at the July 20, 1994, hearing.