In re **MAYER POLLOCK STEEL CORPORATION** d/b/a Pollock Reading, Inc. d/b/a Phoenixville Scrap d/b/a Pollock Steel d/b/a Pollock Columbia d/b/a Pollock–Dixon d/b/a Montgomery Equipment Sales & Services, The Pollock Corporation, Debtors.

Bankruptcy Nos. 93–11975DAS, 93–11977S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 23, 1994.

Peter A. Meltzer, Fellheimer Eichen & Braverman, P.C., Jay G. Ochroch, Fox, Rothschild, O'Brien & Frankel, Philadelphia, PA, for debtors.

Robert Lapowsky, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for Creditors' Committee.

Gretchen Santamour, Lesser & Kaplin, Blue Bell, PA, for Midlantic Bank.

Michael F.J. Romano, Woodbury, NJ, for Orix Credit Alliance.

Leonard P. Goldberger, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for London Salvage & Trading Co.

Michael R. Lastowski, Saul, Ewing, Remick & Saul, Philadelphia, PA, for Gen. Elec. Credit Corp.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Before us is the issue of whether this court should confirm the Debtor's [sic] Joint Amended Second Plan of Reorganization Pursuant to Chapter 11 of Title 11 of the United States Code ("the Plan") over the Objections of the Debtors' largest secured creditor, Midlantic Bank, N.A., successor to Continental Bank ("the Bank"). These Objections are now confined to a few technical issues; a contention that the Bank is not being treated "fairly and equitably," pursuant to 11 U.S.C. §§ 1129(b)(1) and (b)(2)(A) because the Debtor proposes to allow it to choose only an interest rate on its loan balance which is either the present contract floating rate of 1.5 percent above prime or a fixed rate of nine (9%) percent; and an analysis of evidence presented at the hearing which allegedly throws doubt upon the Plan's feasibility, which the Debtors are required to establish pursuant to 11 U.S.C. § 1129(a)(11).

Observing that the Debtors conduct a "real" business of buying, processing, and reselling scrap steel rather than consisting of an entity which merely operates a single asset of real estate, as in many of the cases relied upon by the Bank; that, in addition to the Bank, all but ten small unsecured creditors out of 132 voting secured and unsecured creditors have accepted the Plan; and that none of the issues pressed by the Bank, including feasibility and its own treatment, appear sufficiently meritorious to justify denial of confirmation, we will confirm the Plan.

## B. FACTUAL AND PROCEDURAL HISTORY

MAYOR POLLOCK STEEL CORPORATION, the operating debtor entity, and THE POLLOCK CORPORATION, which manages the foregoing debtor ("the Debtors"), with PEPCO CORPORATION, a related entity the acquisition of which led to much of the Debtors' financial difficulties and whose case was subsequently converted to Chapter 7 and closed as a no-asset case, all filed Chapter 11 bankruptcy cases on April 3, 1993. These cases elicited one previously-reported Opinion, of August 18, 1993, published at 157 B.R. 952 (herein cited as "*Pollock I*"), in which the main players in the confirmation dispute, the Debtors, the Bank, and an active Official Committee of Unsecured Creditors ("the Committee"), joined forces to defeat an alleged reclamation of certain steel products by an unsecured creditor, London Salvage & Trading Co.

It is relevant to reiterate our observations, in *Pollock I, supra,* 157 B.R. at 955, that there had been "an unusually bitter and prolonged struggle between the Debtor and the Bank over the terms of periodic cash collateral orders" at the outset of the case, which spilled over into several later hearings. In deference to the vigor of the Bank's contentions, we allowed the Debtors to make interest payments of about $25,000 monthly to the Bank as adequate protection payments beginning in June, 1993, over the Committee's Objections. The Committee objected even more vigorously to the Debtors' request, in August, 1993, to additionally make payments of principal of about $25,000 more per month as additional adequate protection. However, we allowed all of these payments, totalling about $50,000 monthly, to be made through the present.

After a hearing on a motion of General Electric Capital Corporation ("GECC") for relief from the automatic stay to foreclose on certain equipment leased from it by the Debtors, this court entered an Order of July 9, 1993, requiring the Debtors to pay GECC $6,000 monthly and to file a plan of reorganization and an accompanying disclosure statement on or before November 26, 1993, as a condition for retaining the leased equipment.

However, after the Bank filed, on August 3, 1994, a motion for relief from the automatic stay to foreclose on virtually all of the Debtors' assets, subject to its security interest, the Debtors not only agreed to pay monthly principal and interest payments to the Bank, but also began negotiating a consensual plan with the Bank which would feature the Debtors' obtaining a loan of about $2.1 million to cash out a significant portion of the Bank's remaining debt of about $4 million.

A plan dependent upon such financing was proposed in early 1994, but the requisite funding was not forthcoming. The Bank refused to continue the confirmation hearing and a hearing on its motion for relief beyond April 6, 1994. The Committee at that juncture joined the Bank in insisting that matters be brought to a head, hinting that it intended to file a plan of its own. After a lengthy hearing of April 6, 1994, we entered an Order of April 7, 1994, denying confirmation of the Debtors' plan as "patently infeasible" without its funding in place; terminating the Debtors' exclusivity to file a plan on May 6, 1994; and requiring the Debtors to file a new plan, which would feature an alternative financing proposal and which appeared potentially acceptable to the Bank, and an accompanying disclosure statement, on or before June 24, 1994.

An amended plan and disclosure statement was filed in June, although the Debtors never obtained the hoped-for financing. At the hearing on the disclosure statement accompanying this plan, on July 20, 1994, the Debtors were granted permission to amend the plan again. A disclosure statement accompanying a further slightly amended plan was approved on July 25, 1994, and a confirmation hearing was scheduled on September 14, 1994. After a week's continuance, it was agreed by the Bank, the Debtors, and the Committee that the plan would be amended slightly again and that, if the Debtors failed to achieve confirmation at a final confirmation hearing, set for October 19, 1994, the Bank would forthwith be granted relief from the automatic stay on its motion.

A lengthy contested confirmation hearing of October 19, 1994, ensued. The Debtors made several more modifications to the plan

just before the hearing, most notably adding, to the nine (9%) percent interest rate to be paid to the Bank in the current plan, an option for the Bank to accept the contract rate, a variable rate of prime plus 1.5 percent. After the hearing, in light of the court's assessment of a bevy of technical objections of the Bank to confirmation, the Debtors expressed a desire to make one last round of minor plan amendments. This court issued an Order requiring all amendments to be made by October 24, 1994, and for the parties to thereafter simultaneously submit Opening Briefs and Reply Briefs addressing the issue of confirmation on or before November 4, 1994, and November 10, 1994, respectively.

The Plan, in its final form, is to be funded by the Debtors' operations, downsized to eliminate a low-profit-margin steel brokerage business, which gave rise to the litigation at issue in *Pollock I*, and a $200,000 equity contribution from several shareholders of the Debtors. No loan is now contemplated. Five secured claims, including that of GECC, are placed in respective separate classes. The Bank, the sole member of Class Six, is to be paid a $150,000 lump sum on the effective date of the Plan, plus the proceeds of sale of two parcels of land and certain equipment no longer used in the business, on a total remaining claim of about $3.5 million, reduced from a debt of about $4 million at the time of filing. The balance is to be paid under the terms of a promissory note featuring a rate of interest fixed, at the option of the Bank, at nine (9%) percent or at the present contract rate of 1.5 percent above prime, with a minimum of eight (8%) percent and a maximum payable of eleven (11%) percent, and providing that interest payments over the eleven (11%) percent maximum are to be payable five years after the effective date. Unsecured creditors, whose voting class members' claims totalled about $8 million, were to divide a pot of $250,000 plus half of any unsecured proceeds obtained from certain litigation.

Most of the evidence presented at the hearing of October 19, 1994, focused on the issue of feasibility of the plan. The Debtor also presented investment banker Gabriel Nagy in support of its proposed interest rates payable to the Bank. In his strongest statement in support of the alternative rates offered to the Bank in the Plan, Nagy stated that the highly-preferable variable rate option was comparable to a short term (90–day to 180–day) loan, the federal rate of which was presently between five (5%) percent and five and a half (5½%) percent, rendering the rate of prime plus 1.5 percent offered equal to the risk-free rate plus a risk factor of about four (4%) percent.

The Bank's only witness on the issue of the proper interest rate payable was its loan officer servicing the Debtors' accounts, David Schoenherr, who opined that the interest rate should approach five or six (5% or 6%) percent above prime, a rate which the Debtors had been offered, but had not accepted, in a financing commitment from a loan company, Century Business Credit Co. ("Century").

The Debtors' chief financial officer, Dennis Owens, and the Committee's court-appointed accountant, Richard G. Weisbrot, supported the reasonableness and conservative nature of the Debtors' financial projections attached to their disclosure statement, which it will be recalled was filed back in July, 1994. In fact, Weisbrot noted that the Debtors' had significantly underestimated their post-petition revenues in their initial projections. The Banks' expert critic of the Debtors' projections was accountant Neil Gilmour. Gilmour offered testimony and charts comparing the Debtors' nine-month annualized costs for fiscal year 1993–94 against those predicted by the Debtors for this fiscal year in the projections accompanying their disclosure statement, which were relied upon by Owens and Weisbrot in their testimony. Gilmour's evidence showed great actual deficiencies in expenditures for the categories of "Wages," "Wage Benefits and Taxes," and "Other," which resulted in his computation of a thirty-three (33%) percent deficiency of cash, compared with the Debtors' projections. When the figures as re-computed by Gilmour were substituted for those projected, the Debtors' cash flow would, per Gilmour, be insufficient to support the business and the Plan's payment obligations.

Owens, who appeared surprised and dismayed that Gilmour, who had been employed by the Bank as a consultant for several months, had never shared his misgivings regarding the Debtors' projections with him, took the stand to rebut Gilmour's evidence. He claimed that Gilmour had misleadingly utilized a cash basis to analyze accrued expense projections. The discrepancy with the "Other" category was attributed to insurance payments, legal fees, other remittances, and payments on the Bank's debt itself which would not recur post-petition. The discrepancy in wages was attributed in part to the retirement of shareholder Donald Orr as an employee and downsizing in the brokerage end of the business. Gilmour then cross-rebutted this testimony, stating that a deficiency of about twenty-one (21%) percent could not be explained away and that much of the downsizing had already been completed as of February 1994.

## C. DISCUSSION

### 1. THE BANK'S REMAINING "TECHNICAL" OBJECTIONS PLAINLY LACK MERIT

In its post-trial briefing, the Bank contended that three technical Objections out of about twenty (20) originally asserted survived despite the Debtors' efforts to button up all deficiencies in their several revisions to the Plan. Each of these alleged deficiencies plainly lacks merit for the reasons noted:

■ 1. The Debtors' objections to claims are, allegedly impermissibly, to be limited to those claims identified as objectionable by the Committee, and objections cannot be settled unless the Committee consented. Without citing any Code section offended, the Bank suggests that these provisions deprive the court of its power to independently review of the process of claims allowance. We note, however, that other interested parties, such as the Bank itself, would appear to have standing to object to claims or the settlement of claims, thus preventing the Debtors and the Committee from conspiring to allow unjust claims. *See In re Lease–A–Fleet, Inc.,* 148 B.R. 419, 420–23 (Bankr.E.D.Pa.1992) (creditors permitted to file and litigate objections to administrative claims, as well as

pursue considerable litigation on behalf of the debtor); and *In re Morrison,* 69 B.R. 586, 588–89 (Bankr.E.D.Pa.1987) (a creditor has standing to object to another creditor's claim).

■ 2. The Debtor, again allegedly improperly, attempted to extend the automatic stay beyond the time of confirmation to the time of its discharge. However, confirmation itself discharges the Debtors, *see* 11 U.S.C. § 1141(d)(1)(A), and therefore the objection invokes a distinction without a difference. Furthermore, it is not *per se* improper, although it might render a plan less than "fair and equitable" to certain creditors, to extend the stay beyond confirmation/discharge.

■ 3. The Debtors have included a provision preventing any person or entity from filing any action or performing any act which interferes with the implementation and consummation of the Plan. The Bank contends that this rather innocuous provision represents an effort to extend the discharge injunction provided by 11 U.S.C. §§ 524(a)(2), (a)(3) beyond its permissible bounds. However, we find this Plan provision too lacking in specificity to provide any real enhancement to the powers of this court arising in any event from 11 U.S.C. § 1142.

We therefore turn from the foregoing frivolous technical objections to the Bank's only objections of substance, *i.e.,* to the interest rate offered to it and general plan feasibility.

### 2. THE PLAN, PROVIDING THAT THE BANK MAY PICK BETWEEN A FIXED NINE (9%) PERCENT INTEREST RATE OR THE CONTRACT RATE, A VARIABLE INTEREST RATE 1.5 PERCENT ABOVE PRIME ON ITS CLAIM, ADEQUATELY PROVIDES THE BANK WITH THE PRESENT VALUE OF ITS CLAIM

■ In order to achieve confirmation of the Plan in the face of the non-acceptance of the Plan by the class consisting of the Bank, a secured creditor, the Debtors are obliged to satisfy the requirements of 11 U.S.C. §§ 1129(b)(1), (b)(2)(A). These Code sec-

tions require, pursuant to 11 U.S.C. §§ 1129(b)(2), (b)(2)(A)(i), as follows:

(b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property; ...

In *In re River Village Associates,* 161 B.R. 127, 135–39 (Bankr.E.D.Pa.1993), we surveyed different formulas utilized by various courts in determining appropriate interest rates to be fixed in applying § 1129(b)(2)(A)(i)(II). We acknowledged that, in setting an appropriate rate in a Chapter 13 case, pursuant to 11 U.S.C. § 1325(a)(5)(B)(ii), which utilizes much the same language as § 1129(b)(2)(A)(i)(II), the controlling case of *General Motors Acceptance Corp. v. Jones,* 999 F.2d 63, 67 (3d Cir.1993), established the method of fixing the appropriate deferred interest rate as that which the particular secured lender whose secured claim was being converted into a coerced claim would normally charge for a loan "similar in character" to the "coerced loan" provided for in a plan. However, *Jones* further held that, if the secured creditor "failed to come forward with persuasive evidence that the current rate is in excess of the contract rate," *id.,* at 70–71, then the contract rate should be used.

In *River Village,* we concluded that we could not apply the "similar loan" formulation set forth in *Jones* because the evidence supported the conclusion that neither the secured creditor nor any comparable lenders would make any loan "similar in character" to the "coerced loan" in issue. 161 B.R. at 138. We considered applying the contract rate, noting that the contract rate should always serve as a guide in determining the proper interest rate in a cramdown scenario. 161 B.R. at 138–39. However, we finally determined that the proper interest rate to be used in that setting was "the risk-free rate plus an additional premium for risk." *Id.* at 139. Application of that analysis caused us to ultimately accept as appropriate the nine (9%) percent interest rate proposed by the *River Village* debtor, measured by the six (6%) percent risk-free rate payable on a comparable Treasury Bill, plus a three (3%) percent risk premium. This figure was, moreover, comparable to the contract rate (the regular contract rate was 7.625 percent, but the default rate, which apparently was applicable, was eleven (11%) percent). *Accord, In re Wynnefield Manor Associates,* 163 B.R. 53, 59–60 (Bankr.E.D.Pa.1993) (nine (9%) percent rate approved); and *In re Union Meeting Partners,* 160 B.R. 757, 762, 768 (Bankr.E.D.Pa.1993) (9.125 percent rate, consistent with the contract rate, held acceptable).

Applying the reasoning and comparing the result in *River Village* to the instant fact pattern easily leads to the conclusion that the Debtors' offer of an alternative rate of the nine (9%) percent figure held acceptable in *River Village or* a variable rate consistent with the contract terms is clearly adequate. While the nine (9%) percent fixed rate alone would obviously be questionable in this time of rising interest rates (prime is now reportedly 8.5 percent, whereas it was 7.75 percent at the time of the confirmation hearing), the variable rate option, which almost surely will now be chosen by the Bank, renders the interest rate offered here quite sufficient.

The Bank attempts to avoid this rather clear conclusion with several specious arguments. First, it contends that the presence of the commitment from Century to lend funds to the Debtors at a rate of five to six (5–6%) percent above prime constitutes a loan "similar in character" to the instant "coerced loan," thus bringing these facts outside of those of *River Village*, where there was no evidence that a "similar in character" loan was available, and within the facts of *Jones*. We cannot agree. There is unrebutted testimony by Nagy, an independent expert of unimpeachable credentials, that Century is a commercial finance company whose interest rates cannot be compared with those of commercial banks, like the Bank in issue.

The only testimony in the record regarding the propriety of the Debtors' proposed interest rate, in addition to Nagy's supportive testimony, is Schoenherr's statement that commercial banks do not generally lend at rates more than three (3%) percent above prime and hence the Bank would be unlikely to presently make a loan to the Debtors at any rate normally charged. If anything, this testimony supports the conclusion that the Bank would not make the instant "coerced loan," rendering *Jones* inapplicable and supporting the reasoning of *River Village*.

However, even assuming *arguendo* that *River Village* was incorrectly decided and that *Jones* is the last and only word on the issue of appropriate deferral interest rates under 11 U.S.C. § 1129(b)(2)(A)(i)(II), the Debtors would nevertheless prevail. In that event, we would be compelled to conclude that, since the Bank presented no persuasive evidence that it would make a loan to the Debtors at any rate different from that established in the parties' contract, the variable 1.5 percent above prime rate which appears in the contract and can be carried over to the Plan payments if the Bank chooses the variable rate option and would be sufficient. *See Jones, supra,* 999 F.2d at 70–71.

The Bank also cites, in support of its argument that the interest rate offered to it is inappropriate, *In re Bugg,* 172 B.R. 781, 784–85 n. 2 (E.D.Pa.1994), holding that a fixed rather than a variable rate must be utilized in a § 1129(b)(2)(A)(i)(II) cramdown unless the secured creditor agrees to a variable rate. However, *Bugg* is clearly distinguishable because the instant Plan offers the Bank both a fixed rate (at a rate adopted by this court in such cases as *River Village*) or a variable rate. If the Bank chooses the variable rate, it will effectively have agreed to the use of a variable rate. Also, the *Bugg* record[1] contained no testimony on the issue of the propriety and acceptability to lenders of variable rates, while the instant record includes the unrebutted testimony of Nagy that variable rates are highly preferred to fixed rates by commercial banks.

It also appears that the *Bugg* court overlooked authority contrary to its conclusion regarding the use of variable rates in Chapter 11 cramdowns. *See In re James Wilson Associates,* 965 F.2d 160, 165, 172 (7th Cir. 1992) (rate set at 2.5 percent over Treasury bill rate); *In re Guilford Telecasters, Inc.,* 128 B.R. 622, 626–27 (Bankr.M.D.N.C.1991) (interest rate set at a variable rate 1.5 percent above prime, which was, as in the instant case, also the contract rate). *Cf. In re Patterson,* 86 B.R. 226, 229 (9th Cir. BAP 1988) (variable interest rate is upheld in a Chapter 13 case over the debtor's objection).

We therefore conclude that the Bank's challenges to the interest rate options provided to it in the Plan must fail, and that the Plan meets the criteria of 11 U.S.C. §§ 1129(b)(1), (b)(2)(A)(i)(II).

**3. *DESPITE GILMOUR'S ADVERSE TESTIMONY AND ANALYSIS, THE NON–RIGOROUS STANDARDS FOR PLAN FEASIBILITY ARE SATISFIED HERE***

■ The Bank's most vigorous arguments in opposition to confirmation revolve around

---

**1.** In fact, there was no record made at all in the *Bugg* case. The creditor appealing from the confirmation order, the Federal Home Loan Mortgage Corp. ("Freddie Mae") articulated its objection to the debtors' proposed variable cramdown interest rate for the first and only time in a brief and mildly-asserted oral objection at the confirmation hearing. Freddie Mae offered no evidence on the rate issue. Also, the *Bugg* opinion probably does not make clear that Freddie Mae was a member of a class that accepted the debtors' plan. We note that the *Bugg* decision was appealed to the Court of Appeals, but that the parties have reportedly settled their differences on terms that will include withdrawal of the appeal.

its contention that the Debtors' plan is not feasible, as required by 11 U.S.C. § 1129(a)(11), which reads as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

. . . . .

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

In *In re Calvanese*, 169 B.R. 104, 109 (Bankr.E.D.Pa.1994), in the course of denying confirmation, on the ground of non-feasibility, of an individual debtor's plan which featured a sale of her residential realty preceded by no payments whatsoever to the first mortgagee of the premises, we recited the law regarding plan feasibility and collected our own pertinent authority on this issue in the following passage:

This court has rarely denied confirmation of a plan on the ground of lack of feasibility. As we stated in *In re Orfa Corp. of Philadelphia*, 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991),

"[t]he standards for determining plan feasibility are not rigorous. *See, e.g., In re Temple Zion*, 125 B.R. 910, 914 (Bankr.E.D.Pa.1991); *In re 222 Liberty Associates*, 108 B.R. 971, 985–86 (Bankr. E.D.Pa.1990); *In re Orlando Investors, L.P.*, 103 B.R. 593, 600 (Bankr.E.D.Pa. 1989); and 5 COLLIER ON BANK-RUPTCY, ¶ 1129.2(11) [sic], at 1129–39.11.

'Caselaw has established that bankruptcy court[s] must consider several factors in making a feasibility determination: (1) the adequacy of the debtor's capital structure; (2) the earning power of its business; (3) economic conditions; (4) the ability of the debtor's management; (5) the probability of the continuation of the same management; and (6) any [of] the related matters which deter-

mine the prospects of a sufficiently successful operations to enable performance of the provisions of the plan. *See, e.g., 222 Liberty Associates*, 108 B.R. at 986, *In re Gulph Woods Corp.*, 84 B.R. 961, 973 (Bankr.E.D.Pa.1988), *aff'd*, C.A. No. 88–4081 (E.D.Pa. Feb. 24, 1989); and *In re Landmark of Plaza Park, Ltd.*, 7 B.R. 653, 659 (Bankr.D.N.J.1980).'

*Temple Zion, supra*, 125 B.R. at 915."

We note that, except for *Calvanese* and *Gulph Woods, supra*, we have never relied on § 1129(a)(11) as a basis to deny confirmation of a debtor's plan. In *Calvanese*, we quickly ascertained that the debtor, a housewife attempting to save the marital residence of herself and her husband, whose own efforts at reorganization had recently resulted in Chapter 7 conversions, 169 B.R. at 106, 109–10, met none of the "classic criteria" for feasibility and was a likely candidate for a Chapter 7 conversion herself (which shortly thereafter occurred). In *Gulph Woods*, we found the debtor's plan infeasible because it relies heavily on the "skills" of its controlling shareholder, John S. Trinsey, Jr., a builder and developer whose prior projects had resulted in five previous bankruptcies in this court and who appeared to have delusions of grandeur.[2] The *Gulph Woods* case, despite numerous appeals by Trinsey ending only at the Supreme Court, predictably also ended in a Chapter 7 liquidation.

Suffice it to say that, even if every assertion made by Gilmour were unmistakably correct and his general assessment of the Debtors' prospects were found to be unrebutted, the instant case would hardly compare with the facts of *Calvanese* or *Gulph Woods Corp.*

Moreover, it is clear that Gilmour's specific allegations of inaccuracies are vigorously opposed by Owens, and Gilmour's overall bleak assessment is in stark contrast to the perspective of Weisbrot. While Gilmour's general competency is not questioned, we believe that his willingness to find his own answers

---

**2.** We note that Trinsey has gone on to bigger and better things, such as running for Governor of Pennsylvania, the United States Senate, Presidency of the United States, and, though a non-

lawyer, a seat on the Pennsylvania Supreme Court. Presently his residential realty remains intact due only to his wife's Chapter 13 bankruptcy case.

to his questions concerning the Debtors' numbers was impaired by his client's unremitting opposition to the Debtors' reorganization from the outset of the case. Owens may lack Gilmour's intellectual prowess, and may have been unlikely to answer all (although he did answer some) of the unexpected attacks. However, Gilmour cannot begin to match the commitment of Owens to this business and hence cannot undermine Owens' sincerity and his general credibility regarding a general assessment of the Debtors' prospects.

Weisbrot's disinterest as a professional hired by a Committee whose constituency will receive less than fabulous treatment under the Plan, especially relative to the treatment of Gilmour's client, renders him at least Gilmour's equal as to objectivity. Weisbrot's unique, long-standing experience in the scrap steel industry and his far more extensive and complete commitment to this case render his opinions of necessarily more weight than those of Gilmour.

■ Gilmour was admittedly myopic in failing to ascertain that the allegedly excessive expenditures in the "Other" category were due to payments to the Bank and non-recurring expenditures such as payments to the Bank, legal fee payments, and insurance costs. The discrepancies in the "Wages" and related "Wage Benefits and Taxes" categories are less easily explained. However, as Gilmour himself stated, financial projections are rarely a totally accurate prediction of a company's future. Nor can we expect them to be. At best, they are a rough gauge of a company's prospects in a world which is constantly changing. Given the non-rigorous nature of the feasibility requirement, courts do not require a complete technical accuracy from projections. They only seek a comfort zone as to a company's prospects of avoiding an inevitable liquidation. Irrespective of Gilmour's criticisms, and guessing, but not really being convinced, that some of them have merit, we feel significant comfort with the Debtors' projections of a future productive life and an ability to satisfy the terms of the Plan.

In assessing this issue, we note the oppositional nature of the Bank's positions from the date of filing and its seemingly endless dissatisfaction with the terms of the Debtors' use of cash collateral, through the rather pointless but lengthy hearing on its motion for relief from the automatic stay on April 6, 1994, through its present vigorous assertion of what are, at bottom, rather weak legal and factual positions against confirmation of the Plan. This constant obstructive stance of the Bank has weakened its credibility. In this context, Gilmour is an upscale manifestation of an entity which, from day one, has been like the little boy crying "Wolf!"

The oppositional nature of the Bank has also resulted in the Debtors' being subjected to constant and unremitting pressure. The Debtors' counsel has, for services to the Debtors in the Plan, capped its total fees at $350,000. Much of these very substantial expenditures of legal costs, plus the efforts of the Committee's counsel, also to be paid by the Debtor's estate, were necessitated by the Debtors' need to respond to the Bank's assaults. This has drained funds otherwise payable to not only other creditors, but to the Bank as well. Therefore, claims of wastefulness and mismanagement by the Debtors do not lie gracefully in the Bank's mouth. Moreover, the Bank's position has also resulted in the Debtors' test of their viability by fire. They have been paying the Bank both principal and interest for about 15 months and yet they are now, per Owens, making a profit. It is difficult to say, given these facts alone, that the Debtors cannot survive.

Finally, it is impossible not to notice that the Debtors are not single-asset real estate entities attempting to cling to ownership in a depressed market. The Bank is probably oversecured, as it was compelled to argue in accepting interest as well as principal payments since the early days of the case. Thus, the prospect of a grossly undersecured lender which is at the center of everything in a single asset real estate case is not present here. Unlike the typical single-asset real-estate debtor, the instant Debtors have other large and significant creditors in addition to the Bank. The voice of the other secured creditors who have unanimously accepted the Plan, and that of their Committee and their

constituents who voted in favor of the Plan's confirmation, cannot be silenced or ignored. From a human point of view, there are real jobs and production of assets in the national economy at stake if plan confirmation is denied, relief is granted to the Bank, and liquidation follows. *Compare In re Dollar Associates,* 172 B.R. 945, 949–50 (Bankr.N.D.Cal. 1994); and *River Village, supra,* 161 B.R. at 143 (no such considerations arise in single-asset real estate cases). Processing scrap steel may not be the backbone of the economy or take its place among the most socially significant accomplishments of man, but preservation of entities like the Debtors is, to a large extent, what Chapter 11 of the Bankruptcy Code is all about.

This court, in analyzing the "classic" feasibility criteria, is therefore obliged to distinguish this analysis from that which may appear in single-asset realty cases. Indeed, even among this court's decisions in which infeasibility was *rejected* as ground for challenging confirmation, many of the cases were single-asset realty cases, featuring secured creditors who were hopelessly undersecured and many of whom were faced with plans which exacerbated their risks with payments resulting in negative amortization. *E.g., In re 641 Associates, Ltd.,* 140 B.R. 619, 630–33 (Bankr.E.D.Pa.1992); and *In re 222 Liberty Associates, supra,* 108 B.R. at 985–87, 995 n. 17.

The decision of this court most analogous to the instant case in which the feasibility issue was considered at some length was *Orfa Corp., supra,* 129 B.R. at 409–12. We will compare our analysis of the six "classic criteria" for infeasibility on the facts of that case with our analysis of that criteria on the facts of the instant case. We find the instant Debtors' management team to be of adequate capability and quite loyal. Although they do not have the glowing resumes of the proposed leadership of *Orfa Corp.,* they have a proven track record which we find, again, to be adequate. Despite Gilmour's criticisms, we find that the Debtors' earning power, as reflected in its projections, is adequate to sustain the Plan. No special adverse economic conditions have been identified. While the Debtors' business may not have the upside potential of the innovative *Orfa Corp.* process, it also is *already* a viable concern, something that never happened for the *Orfa Corp.* debtors. *See In re Orfa Corp. of Philadelphia, Inc.,* 170 B.R. 257, 261–62 & n. 4[3] (E.D.Pa.1994). Finally, in *Orfa Corp.,* the debtors had no capital structure at all, rendering them susceptible to total failure if funding never materialized, as in fact it never did. *See id.* The instant Debtors' capital structure is, on the other hand, sufficient to oversecure the Bank and, we think, is sufficient to support a viable plan.

In sum, the Debtors have established that they meet the requisite low threshold of support for the Plan as a viable undertaking by a comfortable margin. The Debtors have proven feasibility by a greater margin of comfort than did the *Orfa Corp.* debtors, who prevailed on this point despite their ultimate failure and conversion of their cases to Chapter 7. The instant facts clearly do not suggest any pitfalls comparable to those perceived by us in *Calvanese* or *Gulph Woods Corp.,* nor is the Plan comparable to a single asset realty debtor's plan dependent on an unlikely market turnaround, like the plan at issue in *In re Lakeside Global II, Ltd.,* 116 B.R. 499, 506–10 (Bankr.S.D.Tex.1989), a case relied upon by the Bank.

In sum, we have no hesitation in concluding that the instant Plan satisfies the § 1129(a)(11) feasibility requirement, even in the face of Gilmour's critical analysis.

### D. CONCLUSION

An Order confirming the Plan in issue will be entered.

---

**3.** We find certain similarities between the litigation tactics of the Bank in this case and the comparable entity in *Orfa Corp.* "Hardball" tactics are rarely productive in circumstances which, like the instant factual setting, do not justify them.