**In re 83–84 116th OWNERS CORP., a/k/a The Ivanhoe, Debtor.**

Bankruptcy No. 897–83645–288.

United States Bankruptcy Court,
E.D. New York.

Nov. 24, 1997.

Eric J. Synder, Pryor & Mandelup, L.L.P., Westbury, NY, for Debtor.

Michael D. Brofman, Certilman Balin Adler & Hyman, L.L.P., East Meadow, NY, for 6645 Equities, L.L.C.

## CORRECTED MEMORANDUM AND ORDER * DETERMINING THAT A CO-OPERATIVE HOUSING PROJECT IS A SINGLE ASSET REAL ESTATE

STAN B. BERNSTEIN, Bankruptcy Judge.

## I. Issue:

Does a co-operative housing corporation fall under the definition of "single asset real

estate" under § 101(51B) of the Bankruptcy Code? Yes.

## II. Background:

### A. The linked section 362(d)(3) issue.

The chapter 11 debtor in possession, a New York housing co-operative corporation, filed a motion for a declaratory ruling that section 101(51B) does not apply to its case. The debtor in possession was justifiably concerned that if it is the owner of "single asset real estate," then it has to comply with § 362(d)(3). That sub-section requires that within ninety days of its petition date, a single asset real estate debtor either files its plan of reorganization or begins making monthly payments "in an amount equal to interest at a current fair market rate on the value of the [mortgagee's] interest in the real estate." Failure of the debtor in possession to comply with section 362(d)(3) affords the mortgagee an express statutory ground for vacating the automatic stay. Under the circumstances of this case, denying this threshold motion will probably be fatal to this reorganization case, for this debtor in possession did not file a plan within the first ninety days of this case (and did not file for an extension within that deadline), and its net operating income is probably insufficient to pay interest at a current fair market rate, depending upon how the "value" of the mortgagee's interest in the collateral is defined and applied. This opinion, however, does not reach the issue of whether the stay must be vacated or modified under the circumstances of this case. We anticipate that the construction of the "value" component in section 362(d)(3) will have to be explored.

### B. The Cadle Company II Litigation.

Contributing to the insufficiency of net operating income is a stalemate between the disputed owner of 27 apartment units in this 56–unit project, The Cadle Company II, Inc.

---

\* This opinion was revised for publication at the request of other bankruptcy judges in this District who view this issue as having significance in similar cases. There are apparently other small co-op projects in financial difficulty, especially in Queens and Kings Counties. Whether they agree with this analysis cannot be disclosed or perhaps known.

(Cadle), and the debtor in possession. Until this dispute is resolved, either by settlement, dispositive motion, or a determination on the merits, the debtor contends, no "rent" or "maintenance" payments can be collected from these units in order to defray any part of the current debt service to the first mortgagee of the project and to continue meeting the pro-rata expenses of maintaining the project and the common areas, fixtures and equipment.

In mid-August of 1996, Cadle filed a declaratory judgment action in the New York Supreme Court for Queens County against the debtor and its affiliate. For reasons that nobody can quite explain, the decision of the trial court to assign this dispute to a "judicial hearing officer" for further disposition was not implemented, although close to one year had passed. Efforts of the Borough President to intervene and settle the dispute in the interim were apparently unsuccessful. With a mortgage foreclosure threatened, the debtor and its affiliate decided that the only way to have this crucial dispute determined was to file a chapter 11 petition and remove the state court action to this court. And that is exactly what the debtor did. Despite this Court's considerable and continuing reservation about deciding matters of state law in what is essentially a two-party dispute, all parties in interest, including the first mortgagee, urged the Court not to abstain from determining this dispute in view of the exigencies of the situation.

At the time this motion was submitted for determination on the briefs, the debtor had not completed its preparation of a motion for summary judgment.

C. The Ivanhoe Project Itself.

This 56 unit co-op project, called "The Ivanhoe," is located at 83–84 116th Street, Kew Garden (Queens County), New York. The "proprietary lessee" to 29 of the units is a first-tier wholly-owned subsidiary of Owners Corp., Holdings Corp. (Holdings). Holdings, in turns, sub-leases 13 of these units to rent-controlled and rent-subsidized tenants; the 14 remaining units are vacant. Cadle claims to own 27 units, a claim which is the subject of the pending adversary proceeding in this case.

There is no genuine dispute about the overall nature of this project as a matter of New York state law. Like other co-op housing projects in New York, the building, equipment and fixtures, and the underlying real estate is owned by a non-profit corporation. The cost of land acquisition and construction of the project as a whole is usually financed through a commercial mortgage, often from an institutional lender which specializes in this form of project financing. The shareholders of the corporation, when they do not hold these units for investment and "sublease" them to tenants, are the "occupants" of the individual co-op apartment units. The co-op corporation is responsible for the general management and maintenance of the building, operating equipment (e.g., the elevators), the grounds and common areas. It also has the authority under its articles and bylaws to determine who is acceptable to the board as a transferee of shares in the corporation. The costs of debt service on the project financing, real property taxes, management and maintenance are passed through on a pro-rata basis to the unit owners. As a matter of form, the relationship between the shareholders-qua-occupants and the co-op corporation is spelled out and governed by a master agreement, called the "Proprietary Lease." The "lessor" is the co-op corporation, and the "lessees" are those entitled to become occupants or sub-lessors of the individual units; the costs of operating and maintaining this project are pro-rated and passed-through to the occupants in monthly assessments called "rent" or "maintenance." The terminology shows perhaps a poverty of legal imagination in nomenclature, but it is no more confusing than similar terminology used in describing "ground leases."

In this case, the co-op is subject to project financing. A first mortgage loan was made by the Dime Savings Bank of New York, FSB, on June 1, 1987. The principal balance of the indebtedness under the first mortgage is approximately $1,330,000. All parties in interest concede that the mortgage is enforceable and the project would be subject to

foreclosure, but for the automatic stay arising from the filing by the co-op corporation of its chapter 11 petition. The mortgage was assigned by its initial holder, The Dime Savings Bank, after the petition was filed, to an entity named 6645 Equities LLC (6645 Equities). Parenthetically, it should be noted that 6645 Equities filed its motion to vacate the automatic stay on November 7, 1997, four days after the issuance of the prior version of this Memorandum and Order on November 3, 1997, as it stated it would during the argument on this motion.

## III. Discussion.

### A. Introduction.

Section 101(51B) defines "single asset real estate" as:

real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted thereto having aggregate noncontingent, liquidated secured debts in an amount no more than $4,000,000.

First things first. It is uncontroverted that the co-op is a single property or project with more than four residential units, and that the corporation has noncontingent, liquidated secured debts in an amount no more than $4,000,000, and that its primary but limited activity is overseeing the management of the project. The debtor in possession has no employees, but oversees this project through its board. In this respect, although the board has general oversight responsibility for managing this project and approving the transfers of shares, there is no other substantial business in which it engages on the premises or elsewhere.

### B. The Debtor's Argument.

The debtor maintains that its co-op project does not fall under the definition of "single asset real estate" for four discrete reasons at varying levels of analytic significance:

Reason 1. The "equity security interest" of the unit owner in the co-op corporation is personal property as a matter of state law; therefore the revenues collected by the co-op corporation are, derivatively, personalty, and not real property.

This "reason" mistakenly confuses the corporation with its members or shareholders and mischaracterizes their dual relationship to the corporation. It is surely not the case, and no one could contend, that the sole source of revenue for the corporation is from capital assessments against the shareholders. It is legally irrelevant to the issue before the Court that the shareholder's interest in the corporation is considered personalty as a matter of state law. At bottom, the shares merely reflect or are tied to the holder's right to occupy (or sublease) an individual co-op apartment unit. It is the right of "occupancy" in the apartment unit held by the "shareholder" or its sublessee which gives rise to the maintenance or rental obligation.

In this respect, it is the shareholder's right to occupy and use a unit as a residence for which that occupant must pay "rent" or "maintenance" that strongly supports the characterization of these payments as directly analogous for state law and bankruptcy purposes as an interest in real estate. And since it is the co-op corporation which is the owner of record of the building, equipment, fixtures, and ground, the debtor in possession's collection of "rent" from the shareholder/unit occupants must be characterized as "income" or "revenue" from the project, or the single asset real estate itself, for purposes of section 101(51B).

Reason 2. For purposes of the Internal Revenue Code, membership assessments are not considered "income."

As is generally the case, the Federal Tax Code has its own mystifying internal logic or rationale. Arguing from federal tax attributes or tax treatments of real estate ownership structures or transactions rarely aids the analysis of provisions under Bankruptcy Code. It is conceded by the mortgagee that the Tax Code treats the co-op corporation as a pass-through entity for real estate taxes and mortgage deductions.

The debtor stoutly maintains that any excess income net of expenses is redistributed

to the shareholders; therefore, the debtor has no "taxable income." True, the debtor's business activity generates substantial revenues and expenses, but by virtue of its own "internal revenue" arrangements under the Proprietary Lease, however, it cannot "earn" any net income.

The mortgagee's retort is: "So what? The tax attributes of the debtor are not relevant to the determination of the issue before this Court under section 101(51B)." The definition under section 101(51B) focuses on "cash flow," not taxable income. If the project is the sole source of substantially all of the revenues collected by its "owner," that is all that matters.

Although perhaps a little remote, but still analogous, is the collection and disbursement of pass-through payments collected during a chapter 11 case by an operating trustee. A bankruptcy court recently held that the collection and disbursement of pass-through payments by an operating chapter 11 trustee to third parties constituted "disbursements" for purposes of calculating the quarterly fees to be paid to the United States trustee. See *In re Betwell Oil & Gas Co.,* 191 B.R. 954 (Bankr.S.D.Fla.1996). In this case, the chapter 11 debtor engages in the same activities by collecting "rent" from the occupants and disbursing those funds to third parties, i.e., the independent contractors who provide the day-to-day maintenance and repair services at the project.

> Reason 3. The income which the debtor generates is from the assessment of unit owners to pay common obligations and is not from the "conduct of business."

In its moving papers, the debtor argues that "[a] co-operative corporation is the 'antithesis of a business.' It operates for the benefits (sic) of its patrons and not as a commercial activity." The thrust of this point is parried by the mortgagee. Every corporation is operated for the "benefit" of its shareholders, whether for commercial, charitable, or other non-profit purposes. When a non-profit corporation operates a 500–bed hospital to provide tertiary medical care for its admittees, its hundreds of millions of dollars of annual revenues in fees for service charged to its patients or to third-

party payors is still "income" arising from the business of running a hospital, notwithstanding that there is no distribution or other economic benefit to its members or shareholders.

The debtor is, from the vantage point of the Bankruptcy Code, undeniably in the business of running the co-op apartment project. It is irrelevant, as a matter of bankruptcy law, that the expenses incurred by the co-op corporation for mortgage debt services and under service contracts with independent contractors who provide physical maintenance for the project are supposed to be passed-through to the occupants of the units without any "profit." The point is that the debtor in possession collects those payments from the occupants of the units as rent or pro-rata maintenance, and that is its primary business activity.

There is also another sense in which the debtor's argument is far off the mark. The issue under section 101(51B) is not whether the debtor in possession "conducts a business" in connection with the project, but whether that business is **substantial** or not. In this case, the mortgagee would probably not dispute the debtor's contention that whatever "business" the board engages in is not substantial; nevertheless, it is still revenue-producing, and that is what counts.

> Reason 4. The debtor is not the type of entity that Congress intended to be included in the definition of "single asset real estate."

The final and by now very redundant argument of the debtor is that this single asset real estate project is not the kind of entity that Congress intended to capture within the definition of section 101(51B). The debtor, however, presented no legislative history that might stand as parol evidence of Congressional intent, assuming it were admissible. In this instance, we need not, and, under the prevailing and familiar decisions of the United States Supreme Court, we can not probe Congressional intent, for the language of section 101(51B) is not ambiguous. Perhaps the language, as applied to the full range of real estate projects on the ground, may be viewed as unintentionally overinclusive, but there is

nothing absurd or meaningless in applying the language of this section to a co-op housing project. Like the robe this judge wears, a loose-enough fit is all that is required for the occasion.

What is crucial for understanding this case, especially within the framework of Congressional policy written into the 1994 amendments at issue, is that from the standpoint of the holder of a defaulted project mortgage, this case is not at all different in any material respect from any other chapter 11 case filed by a "for-profit" owner of an apartment house. There is no dispute that this is a "distressed property." Half of the units owned by Holdings are unrented and in their present uninhabitable condition, unrentable.

If one were to fly in a helicopter over two adjacent projects, one multi-family residential project owned by a co-op corporation and a second multi-family residential project owned by a for-profit corporation or limited partnership, from that height, the projects would look exactly the same. If one were to drive by both projects, both projects would also look exactly the same from the curb. And if one were to drop in to visit one's elderly aunt in either project, both buildings and the apartment units would both look the same. For bankruptcy purposes, both projects are the same, regardless of their "profit" or "not-for-profit" status.

True, the filing of this case may not be subject to dismissal as a bad faith filing, for its sole purpose was not to frustrate the project financer's foreclosure of its mortgage. The debtor also claims it needed to have a determination on the merits of its state court action, although docket congestion in the state courts is hardly a recognized ground in the case law to justify filing a chapter 11 case for the express purpose of removing state court litigation to a specialized federal court of limited jurisdiction. Nevertheless, to the extent that the consensual remedies of the project mortgagee are impaired, section 101(51B), read in conjunction with section 362(d)(3), is nothing more than an "off-the-rack" rule governing the expedited disposition of single asset real estate cases. To the mortgagee, this has to be "a single asset real estate case," for the project surely physically resembles every other single asset real estate project, the debtor in possession has been in material prepetition default in payments and other mortgage covenants, and the debtor in possession is ill disposed to lifting the automatic stay so that the mortgagee can foreclose its mortgage. The mortgagee was kind enough not to refer to the empiricist's strategy for answering the query: Is this a "duck?"

The reported cases on section 101(51B) do not offer much guidance to the determination of the precise issue before this Court. Some focus on real estate holdings which are found not to be "single asset" cases. See *In re Philmont Development Co.,* 181 B.R. 220 (Bankr.E.D.Pa.1995)(three semi-detached single-family houses owned by a limited partnership). Others focus on a range of different kinds of commercial activities conducted at a single site, which defeat categorizing the property as "single asset real estate." See also *In re Kkemko, Inc.,* 181 B.R. 47 (Bankr. S.D.Ohio 1995)(270 slip marina, with substantial ancillary fee-for-services to boat owners leasing the slips).

The *Kkemko* court did, however, comment that it read Congress' intent to limit the scope of definition to apartment buildings, small strip shopping centers, or undeveloped parcels of land. The *Philmont* court also noted, "The terms single asset case, or single asset real estate case, are well known and often used colloquialisms which essentially refer to real estate entities attempting to cling to ownership of real property in a depressed market, much like the instant debtors, rather that businesses involving manufacturing, sales, or services," 181 B.R. at 223 (Bankr.E.D.Pa.1995) *citing In re Mayer Pollock Steel Corp.,* 174 B.R. 414, 422–23 (Bankr. E.D.Pa.1994). The defining criteria assumed ownership by an entity whose sole purpose was to operate that real estate with monies generated by the real estate.

Behind this adoption of a colloquial expression, which was used as an ordinary language term for describing and decrying hundreds of prior bankruptcy cases, a "single asset real estate case" has never been a term free of "affect" or opprobrium. "Single asset real

estate cases" were and remain the most egregious example of "bad faith filings." In discussing the concept of "voluntariness," the British ordinary language philosopher, J.L. Austin, noted that we tend to use the term "voluntary" only when there is something "suspect" or "fishy" about a particular action under scrutiny. So it is that a criminal jury is instructed to find whether the defendant "pulled the trigger **voluntarily?**" "Single asset real estate cases" are, in this same sense, also "suspect" or "fishy." Of course, we resist the painful pun that this debtor's gun shoots blanks.

■ Many of the circuit courts of appeals decisions before the 1994 amendments repeatedly found "bad faith" in the filing by a single asset real estate developer or owner. The chapter 11 petition is found in these cases to have been filed primarily to frustrate the exercise of foreclosure remedies of a commercial mortgagee when there were really no unsecured creditors, no equity in the property, and no reasonable probability of a feasible plan "in prospect." In many respects, section 101(51B) was intended to put a damper on the filing of bad faith "single asset real asset" cases, codifying *In re Albany Partners, Ltd.*, 749 F.2d 670 (11th Cir.1984); *In re Boulders On the River, Inc.*, 164 B.R. 99 (9th Cir. BAP 1994). This was a lobbying victory for the commercial mortgagees with a minor twist.

To limit the discretion of bankruptcy judges and to minimize litigation, the amendment imposes a mechanical test, and its application is limited to projects with a secured indebtedness under $4,000,000. Inevitably, there has been persistent lobbying pressure on Congress ever since to remove the $4,000,000 ceiling all together. If that happens, the concept of single asset real estate cases may take on a much greater statistical significance in reporting case filings.

Undercutting the ground from the debtor is some of the fugitive and sparse legislative history to this section. The Hon. Charles E. Schumer of the House of Representatives in a speech on the Bankruptcy Reform Act of 1994 sought to have the definition "clarified" to have co-op's excluded, but the Conference Report accompanying the final bill ignored this request for a clarification. This supports the inference that since Congress was made aware of a potential issue over co-op projects, and chose not to act; then the definition as enacted extends to include co-ops. 140 Cong. Rec. § 14,597 (daily ed. October 7, 1994). A copy of this opinion will, no doubt, be sent to Congressman Schumer by one of his many co-op constituents as a gentle reminder of an amendment not corrected.

■ Because co-op projects are unlike commercial apartment projects in terms of their internal organization structure, and because there are thousands and thousands of co-op units in concentrated urban areas like Greater Metropolitan New York City, perhaps as a matter of public policy Congress should exclude co-op housing projects from the definition of "single asset real estate" cases, especially if the $4,000,000 cap on secured indebtedness is materially raised or even lifted entirely. But until Congress amends the definition of section 101(51B), this Court has no discretion or authority to carve out a judicial exception from the unambiguous words of the statute, no matter how many of his friends, relatives and fellow judges live in co-op apartments.

## IV. Conclusion:

For these reasons, the Court concludes that section 101(51B) applies to this single asset real estate project. The Debtor's Motion for a declaratory ruling in its favor is denied. This matter will be dealt with further at the anticipated consolidated preliminary and final hearing on the motion to vacate the stay.

**So Ordered.**